*MICHAEL PUGH vs.*
*MERIC*

---

*MICHAEL PUGH*
*February 28, 2019*

---



**ELLEN GRAUER**
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

*Original File 263314.TXT*
*Min-U-Script® with Word Index*

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK
     -------------------------------------------------X
 3   MICHAEL PUGH,

 4                            Plaintiff,

 5       -against-

 6   MERIC,

 7                            Defendant.

 8   Case No. 1:18-cv-03556
     -------------------------------------------------X
 9

10                            One Penn Plaza
                              New York, New York
11
                              February 28, 2019
12                            10:00 a.m.

13

14           EXAMINATION BEFORE TRIAL of MICHAEL PUGH,

15   taken pursuant to Notice, before Nicole L.

16   Basile, a Notary Public of the State of New York.

17

18

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO., LLC
              126 East 56th Street, Fifth Floor
24              New York, New York 10022
                       212-750-6434
25                     REF:   263314
```

```
 1   A P P E A R A N C E S :

 2

 3   DAVID ABRAMS

 4   Attorney for Plaintiff

 5        305 Broadway, Suite 601

 6        New York, New York  10007

 7   BY:  DAVID ABRAMS, ESQ.

 8

 9

10   LEVIN-EPSTEIN & ASSOCIATES, P.C.

11   Attorneys for Defendants

12        One Penn Plaza, Suite 2527

13        New York, New York  10019

14   BY:  JASON MIZRAHI, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

```
1    ------------------ I N D E X --------------------
2    WITNESS                 EXAMINATION BY        PAGE
3    MICHAEL PUGH            JASON MIZRAHI            5
4
5
6    --------------- E X H I B I T S ----------------
7    DEFENDANT       DESCRIPTION           FOR I.D.
8    Exhibit 1       State court complaint        12
9    Exhibit 2       State court complaint        18
10   Exhibit 3       Offer letter                 31
11   Exhibit 4       Time sheets                  54
12   Exhibit 5       Wage statements              64
13   Exhibit 6       Minimum wage poster          66
14   Exhibit 7       Recommendation letter        81
15   Exhibit 8       Linked profile              104
16
17
18            (EXHIBITS TO BE PRODUCED)
19
20
21
22
23
24
25
```

```
 1                    S T I P U L A T I O N S

 2

 3            IT IS HEREBY STIPULATED AND AGREED by

 4   and between the attorneys for the respective

 5   parties herein, that the sealing and filing of

 6   the within deposition shall be waived.

 7

 8            IT IS FURTHER STIPULATED AND AGREED

 9   that such deposition may be signed and sworn to

10   before any officer authorized to administer an

11   oath, with the same force and effect as if

12   signed and sworn to before the officer before

13   whom said deposition is taken.

14

15            IT IS FURTHER STIPULATED AND AGREED

16   that all objections, except as to form, are

17   reserved to form, are reserved to the time of

18   trial.

19

20

21

22

23

24

25
```

1  M I C H A E L      P U G H, the Witness herein,

2      having been first duly sworn by a Notary

3      Public in and of the State of New York,

4      was examined and testified as follows:

5

6          THE COURT REPORTER:  Please state your

7  name and address for the record.

8          THE WITNESS:  Michael Pugh.  936

9  Carpal Avenue, Bronx, New York 10456.

10

11  EXAMINATION BY.

12  MR. MIZRAHI:

13      Q.  Good morning, Michael.

14      A.  Good morning.

15      Q.  My name is Jason Mizrahi.  I represent

16  the defendant in this matter.  And we are here

17  today for a deposition.  I am not sure if this is

18  your first deposition, but I would like to begin

19  by just laying some ground rules.

20      A.  Okay.

21      Q.  Letting you know what you can expect,

22  just so we can facilitate this in the easiest way

23  possible.  I am going to be asking you some

24  questions.  Okay.  And if you don't understand a

25  question, just let me know.  I will be happy to

PUGH

```
 1
 2   rephrase it.  If you want to take a break at any
 3   time, feel free to do so.  I only ask that if
 4   there is a question being presented, answer the
 5   question before we stop to take a break.  Okay?
 6           A.  Okay.
 7           Q.  Make sure that you speak loudly and
 8   clearly, and give verbal responses so that the
 9   court reporter can hear you.  What that means is,
10   please make sure not to give nonverbal responses.
11   Don't shake your head, don't nod your head, just
12   be sure to speak in a loud clear voice.
13        Michael, before appearing here today, did
14   you have any alcoholic beverages in the last 24
15   hours?
16           A.  Yes.  I did.
17           Q.  What did you have and when?
18           A.  What did I have?  I just had a
19   cocktail.
20           Q.  What cocktail?
21           A.  What cocktail?  Does that have
22   anything to do with the case?
23           Q.  The reason I'm asking is because I am
24   interested in knowing if you've taken anything
25   that may impair your ability to speak truthfully,
```

```
 1                      PUGH
 2    here, today.
 3            A.   Thank you for explaining.
 4            Q.   Sure.
 5            A.   It was a Coors beer.
 6            Q.   A beer?
 7            A.   Yes.
 8            Q.   And when did you have it?
 9            A.   Like, around 8 p.m., last night.
10            Q.   How many alcoholic beverages did you
11    have in the last 24 hours?
12            A.   Just one.
13            Q.   Do you think that would impair your
14    ability to speak truthfully and honestly today?
15            A.   Of course not.
16            Q.   Are you currently taking any
17    prescription medications?
18            A.   No.  I am not.
19            Q.   Are there any medications that you
20    should have been taking but you haven't taken in
21    the last 24 hours?
22            A.   No.
23            Q.   Michael, what did you do to prepare
24    for today's deposition?
25            A.   Nothing.  Spoke to my attorney.  That
```

```
 1                          PUGH
 2   is it.
 3          Q.  Besides speaking to your attorney, did
 4   you do anything to prepare for today's
 5   deposition?
 6          A.  No.  I have not.
 7          Q.  Other than your attorney, have you
 8   communicated with anybody else about this
 9   lawsuit?
10          A.  No.
11          Q.  Michael, have you ever been arrested?
12          A.  I have.
13          Q.  Can you please describe the
14   circumstances surrounding the arrest?
15              MR. ABRAMS:   Well, hold on a second.
16              MR. MIZRAHI:  Are you instructing your
17   client not to answer?
18              MR. ABRAMS:   I might be.  Just give
19   me a second. You know, I will let you ask him
20   about convictions.  If he has been convicted in
21   the last ten years of any felony or any
22   misdemeanor that relates to dishonesty.
23              MR. MIZRAHI:  I am going to ask him
24   about any prior criminal history and I am going
25   to use it to go toward impeachment purposes.  And
```

```
 1                          PUGH
 2   if we need to get the court on the phone, we can
 3   get the court on the phone.
 4                MR. ABRAMS:   You don't have to tell
 5   him about an arrest --
 6                MR. MIZRAHI:  Please don't instruct
 7   the client.
 8                MR. ABRAMS:   I am instructing my
 9   client not to answer your question about arrest.
10   If you want to ask him about actual convictions
11   in the last ten years, that is completely fine.
12        Q.  Michael, have you ever been arrested?
13                MR. ABRAMS:   Don't answer that.
14   Should we call the court?
15        Q.  Michael, have you ever been convicted
16   of a crime?
17        A.  No.
18        Q.  Have you been involved in any criminal
19   proceedings?
20        A.  No.
21        Q.  Before answering the question, you had
22   told me that you have been arrested before?
23                MR. ABRAMS:   You know what, I am
24   directing my client not to answer.  If you want
25   to call the court, it's up to you.
```

```
 1                         PUGH

 2              MR. MIZRAHI:  Yes.  We are going to

 3     give the court a call.

 4              MR. ABRAMS:   Let the record reflect

 5     that the attorney for the defendant has exited

 6     the room.

 7              (A discussion was held off the

 8              record.)

 9              MR. MIZRAHI:  We are ready to

10     continue.

11         Q.  Michael, have you ever committed a

12     crime?

13         A.  No.

14         Q.  Have you ever been involved in any

15     other legal claims or proceedings?

16         A.  No.

17         Q.  Are you sure?

18              MR. ABRAMS:   Hold on a sec [sic].

19     You can answer.

20         A.  I already answered your question.

21         Q.  Please, answer the question.

22         A.  I answered the question already.

23         Q.  I just want to make sure.  Is that

24     your testimony here today, that you have never

25     been involved in any other claims or any other
```

```
1                         PUGH
2   legal proceedings besides this case?
3          A.   Yes.
4          Q.   Okay.  Are you familiar with an action
5   filed in the Supreme Court of the State of New
6   York captioned Pugh v Bestall Moda, LLC?
7          A.   You can ask my attorney.
8          Q.   Please answer the question, Michael.
9               MR. ABRAMS:   You know, I think, if
10  you could address my client by his last name.  I
11  think that would be more respectful, if you don't
12  mind.
13         Q.   Sir, please answer the question?
14         A.   You can rephase your question.
15         Q.   Are you familiar with an action filed
16  in the Supreme Court of the State of New York
17  captioned Pugh v Bestall Moda, LLC?
18         A.   You can ask my attorney.
19         Q.   Mr. Pugh, please answer the question.
20  Your attorney is not here for his deposition.
21  You are here for your deposition.  So I am going
22  to respectfully ask that if there's a question
23  being presented, that you answer the question.
24         A.   I don't understand the question.
25         Q.   Have you ever filed a lawsuit in the
```

```
 1                    PUGH
 2   state of New York?
 3        A.   No.
 4             MR. MIZRAHI:  Defendants would like to
 5   admit into evidence Exhibit 1.  If you could
 6   please mark the State Court Complaint as Exhibit
 7   1.
 8             (Defendant's Exhibit 1, STATE
 9             COURT COMPLAINT, was marked
10             for identification.)
11             MR. MIZRAHI:  David, if you would like
12   a copy (handing).
13        Q.   I am handing you a document that says
14   complaint -- a summons and complaint that was
15   filed in the State Court.  If you would like to
16   take a moment to review it (handing).
17        A.   (Perusing.)
18        Q.   Have you finished reviewing it?
19        A.   Yes.
20        Q.   Mr. Pugh, do you recognize this
21   document?
22        A.   I do.
23        Q.   What is it?
24        A.   What is it?
25        Q.   Yes.
```

```
 1                      PUGH
 2         A.   What do you mean, what is it?
 3         Q.   What is this document?
 4         A.   This document -- I don't know.  I
 5    mean, it's lawyer stuff.
 6         Q.   Does your name appear anywhere in this
 7    document?
 8         A.   Yes.  My name do [sic] appear.
 9         Q.   Where does it appear?
10         A.   At the top.
11         Q.   Okay.  And why does your name appear
12    at the top of this document?
13         A.   This is a document that -- I mean, I
14    don't know what this document is.  I know my name
15    is there.
16         Q.   Okay.  Why is your name there?
17         A.   Why is my name there?  This is lawyer
18    -- a lawyer document.
19         Q.   Have you ever seen this document
20    before today?
21         A.   I believe I did.  Yes.
22         Q.   Where did you see it?
23         A.   You can ask my attorney.
24         Q.   Mr. Pugh, again, I am going to remind
25    you that your attorney isn't here for his
```

```
 1                          PUGH
 2    deposition.  So respectfully, I am asking that if
 3    I am asking you a question, you have to answer
 4    the question.
 5            A.  Got it.
 6            Q.  Unless your attorney specifically
 7    instructs you not to, you have to answer the
 8    question that I am asking.
 9            A.  Okay.
10            Q.  Have you seen this document before
11    today?
12            A.  Yes.
13            Q.  Where have you seen it?
14            A.  At my attorney's office.
15            Q.  Can you please describe the
16    circumstances surrounding when you've last seen
17    this document?
18                MR. ABRAMS:   I am directing my client
19    not to disclose any conversations he may have had
20    with me concerning this document or the
21    circumstances.
22                MR. MIZRAHI:  That's fine.
23            Q.  Mr. Pugh, without going into any of
24    the details regarding the discussions that you
25    had with your attorney, can you please describe
```

PUGH

1
2  the circumstances surrounding when you've seen
3  this document?
4       A.  About a year ago.
5       Q.  Tell me about it.
6       A.  Tell you about it, like as in --
7       Q.  So I am interested in knowing what you
8  know about this document, because it seems to me,
9  like you don't know much about what it is, and
10  what it contains, and what it says.  So I would
11  like to know what you know about it, because it
12  is directly relevant to this case.
13            MR. ABRAMS:  And I am instructing my
14  client not to divulge any information, which, is
15  from conversations he had with me.
16       A.  I agree.
17       Q.  Can you please --
18            MR. ABRAMS:  It doesn't matter if you
19  agree or not.
20       Q.  You have to answer the question,
21  Mr. Pugh.  Can you tell me about the
22  circumstances leading up to filing this lawsuit?
23            MR. ABRAMS:  And, again, I am
24  directing my client not to disclose any
25  conversations he had with me, regarding the

```
 1                         PUGH
 2    filing of the lawsuit.
 3            Q.   Mr. Pugh, is this a lawsuit filed in
 4    the state of New York?
 5            A.   This is.
 6            Q.   What is this lawsuit about?
 7            A.   What is it about?
 8            Q.   Yes.
 9            A.   It is about the case that I have
10    against Bestall.
11            Q.   Tell me about the case.
12            A.   What do you want to know about the
13    case?
14            Q.   Can you please describe the case to
15    me?
16            A.   Describe the case?
17            Q.   Yes.
18            A.   As in, what?
19            Q.   Please answer the question.
20            A.   You didn't give me a correct question.
21    I don't know what you are trying to ask me.
22            Q.   I would like you to describe what this
23    case is about, using your own words.
24            A.   The case is about me and Bestall.  And
25    me being treated unfairly.
```

```
 1                      PUGH
 2          Q.   Why did you sue Bestall?
 3          A.   For unpaid wages.
 4          Q.   What are you seeking to recover in
 5   this lawsuit?
 6          A.   Excuse me?
 7          Q.   What are you seeking to recover in
 8   this lawsuit?
 9          A.   It clearly states here, right?  I
10   mean, I was unpaid unfairly.  I mean, not fairly,
11   but I was just unpaid unfairly.
12          Q.   Sir, please.  Sir, if you can answer
13   the question.  What are you seeking to recover,
14   what is your goal, what would you like to receive
15   by filing this lawsuit?
16          A.   My goal is just, you know, so it won't
17   happen to somebody like me.
18          Q.   Okay.  Are you seeking recovery of
19   your back paid wages -- of your alleged back paid
20   wages?
21          A.   My alleged, no.  It is the correct
22   thing.  They didn't pay me, so I think I should
23   be entitled to that.
24          Q.   And is that why you filed this lawsuit
25   in State Court?
```

```
 1                      PUGH
 2        A.   Yes.
 3             MR. MIZRAHI:  Defendants would like to
 4   mark into evidence, Exhibit 2.
 5             (Defendant's Exhibit 2, STATE
 6             COURT COMPLAINT, was marked
 7             for identification.)
 8        Q.   Mr. Pugh, I've handed you --
 9             MR. ABRAMS:   After this question, if
10   you don't mind, I would like to take a break and
11   have a chat with my client.
12             MR. MIZRAHI:  Sure.
13             MR. ABRAMS:   I mean, I think it would
14   be helpful to you.
15        Q.   Mr. Pugh, I have handed you a
16   document.  Please take a minute to familiarize
17   yourself with the document.
18        A.   (Perusing.)
19        Q.   Mr. Pugh, have you had a moment to
20   familiarize yourself with this document?
21        A.   Yes.
22             MR. ABRAMS:   Okay.  So I just need to
23   talk to him for a minute.
24             MR. MIZRAHI:  Sure.
25             (A discussion was held off the
```

```
 1                        PUGH
 2           record.)
 3           Q.  Mr. Pugh, are you familiar with this
 4   document?
 5           A.  This document, I don't -- I am not
 6   familiar.  Like, I don't -- I've probably seen it
 7   before, but it looks like it is the same
 8   document, but different wording on the paper from
 9   Exhibit 1.
10           Q.  Mr. Pugh, are you familiar with this
11   document?
12           A.  I don't know.
13           Q.  Mr. Pugh, have you ever seen this
14   document before?
15           A.  I don't know.
16           Q.  Mr. Pugh, does your name appear
17   anywhere on this document?
18           A.  Yes.  It do [sic].
19           Q.  Where does it appear?
20           A.  At the top left corner.
21           Q.  And why does your name appear there?
22           A.  Why does my name appear there?  I
23   don't know.
24           Q.  Mr. Pugh, do you know that you're a
25   plaintiff in a pending lawsuit --
```

```
 1                         PUGH
 2          A.   I do know that.
 3          Q.   -- in the Federal Court of the
 4   Southern District of New York?
 5          A.   Yes.
 6          Q.   Do you know that there was a summons
 7   and a complaint filed in that lawsuit?
 8          A.   A summons and a complaint.  Can you
 9   rephase your question?
10          Q.   Do you know what a summons and
11   complaint is?
12          A.   I know what a summons is.
13          Q.   Do you know what a complaint is?
14          A.   I know what a complaint is.
15          Q.   Do you know that there was a complaint
16   filed in this lawsuit?
17              MR. ABRAMS:   And hold on a second.
18   And I am directing my client not to provide an
19   answer that includes information gained from
20   conversations between him and me.
21              MR. MIZRAHI:  You can object, but
22   we're going to continue.
23              MR. ABRAMS:   I am not objecting.  I
24   am just telling my client that in answering the
25   questions, he is not to reveal any conversations
```

```
                         PUGH
 1
 2   he had between me and him, because those, of
 3   course, would be privileged.  And if he has
 4   independent knowledge, he is perfectly free to
 5   share it.
 6        Q.  Mr. Pugh, why does your name appear on
 7   this document?
 8        A.  I don't know.
 9        Q.  Mr. Pugh, did you have a moment to
10   familiarize yourself with this document?
11        A.  I've read the document.
12        Q.  And what is it?
13        A.  What is it?  It says a ton of things.
14        Q.  What does it say?
15        A.  Some of the words on document -- on
16   the document, I don't really understand.  So I
17   don't know.
18        Q.  Is it your testimony here, today, that
19   you don't understand the words in this document?
20        A.  (Perusing.)  Some of them I do
21   understand.  Looks like I wasn't paid overtime,
22   et cetera.
23        Q.  Sir, can you please describe what this
24   document is?
25        A.  Describe what it is?
```

```
                          PUGH
```

1

2          Q.   Yes.

3          A.   I don't know what it is.   I mean, I

4    just know that it says overtime pay, which I know

5    is going on along with my case, et cetera.

6          Q.   Mr. Pugh, did you file a lawsuit in

7    State Court in 2017?

8               MR. ABRAMS:   And I am just going to

9    direct my client, that when he answers that

10   question, he should not reveal information

11   arising from conversations between him and me.

12   As those would be attorney-client privilege.

13         Q.   Mr. Pugh, did you file a lawsuit in

14   the state of New York in 2017?

15         A.   I can't remember.

16         Q.   I am going to refresh your

17   recollection.   If you can please direct your

18   attention to Exhibit 1.   I am going to ask you

19   again, did you file a lawsuit in the state of New

20   York in 2017?

21         A.   Against who?

22         Q.   Against anybody?

23         A.   Yes.   I did.

24         Q.   Did you file a lawsuit in 2017 against

25   your former employer?

```
1                         PUGH
2          A.  Yes.  I did.
3          Q.  Did you file a lawsuit in Federal
4     Court in the Southern District of New York in
5     2018?
6          A.  Yes.  I did.
7          Q.  Did you file that lawsuit also against
8     your former employer?
9          A.  Yes.  I did.
10         Q.  Is it the same employer in both
11    lawsuits?
12         A.  Yes.
13         Q.  Are those two lawsuits identical?
14         A.  It should be.
15         Q.  Okay.  Why did you file two identical
16    lawsuits against your former employer?
17         A.  I don't know.
18         Q.  Why would you think that you would
19    file two identical lawsuits against your former
20    employer?
21         A.  I am not an attorney.
22         Q.  Did you instruct your attorney to file
23    a lawsuit in the state of New York in 2017?
24    Please answer the question.
25              MR. ABRAMS:   I am directing my client
```

```
                              PUGH
 1

 2   not to answer the question.  Don't answer that.

 3            MR. MIZRAHI:  We are going to call the

 4   court.  Before we continue, what is the basis of

 5   your objection?

 6            MR. ABRAMS:   I am not going to let

 7   you ask questions about conversations between my

 8   client and I.  It is all attorney-client

 9   privilege.

10            MR. MIZRAHI:  Can you please reread

11   the last question that was posed?

12                (The requested portion of the

13                record was read by the court

14                reporter.)

15            MR. MIZRAHI:  Are you still

16   maintaining that basis of your objection via

17   attorney-client privilege?

18            MR. ABRAMS:   I think so.  Unless, do

19   you have an understanding of the attorney-client

20   privilege that's different than mine.  As I

21   understand it, you can't ask about conversations

22   he had with me.

23            MR. MIZRAHI:  Okay.

24       Q.  Mr. Pugh, for the remainder of the

25   deposition, I am going to be sometimes referring
```

```
1                        PUGH
2     to Bestall Moda, LLC, as Bestall Moda or Bestall.
3     Are you familiar with Bestall Moda?
4            A.   Yes.  I am.
5            Q.   What is it?
6            A.   A company.
7            Q.   What kind of company is it?
8            A.   A shirt makers company.
9            Q.   Can you please describe how you are
10    familiar with them?
11           A.   I was the operations manager for their
12    store.
13           Q.   Tell me about it.
14           A.   Tell you about a shirt making company?
15           Q.   Can you just tell me about what you
16    did as an operations manager for their store?
17           A.   I was in control of their store.
18           Q.   When did you first start performing
19    services for Bestall Moda?
20           A.   I can't remember.
21           Q.   Was it in 2015?
22           A.   2015?  I mean, we are in 2019.  So it
23    had to be like about two or three years ago.
24           Q.   When did you first start working at
25    Bestall Moda?
```

```
1                        PUGH
2         A.  I don't know.
3         Q.  If I can direct your attention to
4    Exhibit 2 and if you could please take a moment
5    to refresh your recollection by reading paragraph
6    five.
7         A.  (Witness complies.) Okay.
8         Q.  According to the summons and complaint
9    in this action, when did you first start
10   performing services for Bestall Moda?
11        A.  A year from May 2017.
12        Q.  So it is your testimony that you
13   started working for Bestall Moda on or around May
14   of 2016?
15        A.  I don't know.
16        Q.  When did you first start working at
17   Bestall Moda?
18        A.  I had several jobs after that.  So I
19   don't know.
20        Q.  Do you recall the circumstances
21   surrounding when you first started working at
22   Bestall Moda?
23        A.  What is that pertaining to, what
24   circumstances?
25        Q.  Do you recall the events leading up to
```

```
 1                         PUGH
 2    when you first started working at Bestall Moda?
 3           A.   What events?
 4           Q.   Generally, the events that had led up
 5    to you starting to work at Bestall Moda?
 6           A.   What are you trying to ask me, because
 7    I don't know.
 8           Q.   Do you remember when you were first
 9    hired at Bestall Moda?
10           A.   I don't know when I was first hired
11    and the date of it.
12           Q.   Do you remember the circumstances,
13    besides the date and the time, around when you
14    first started working?
15           A.   I don't know.  I had several jobs
16    after that.  So I don't know.  There are a lot of
17    dates in my head.
18           Q.   Before you started working at Bestall
19    Moda, were you interviewed?
20           A.   Yes.
21           Q.   Who were you interviewed by?
22           A.   Illiya's partner, Vincent.
23           Q.   Do you remember his full name?
24           A.   Vincent, starts with an O or something
25    like that.
```

```
 1                          PUGH
 2           Q.  If I represented to you that his last
 3      name was Ordioni.  Is that someone who you are
 4      familiar with?
 5           A.  I don't know.  I didn't -- I don't
 6      know.
 7           Q.  What did you and Vincent talk about
 8      when you were first discussing your employment
 9      with Bestall Moda?
10           A.  We talked about my employment.
11           Q.  Can you please tell me what you talked
12      about?
13           A.  About either getting hired, or not.
14           Q.  Did you discuss what your payment
15      would be?
16           A.  He had to get confirmation from
17      Illiya.
18           Q.  Please answer the question.
19           A.  That was the answer.
20           Q.  My question was, whether or not you
21      and Vincent discussed what your payment would be?
22           A.  We did.
23           Q.  And what did you discuss?
24           A.  What did we discuss?  My payment.  11
25      dollars.
```

```
 1                        PUGH
 2          Q.   So you discussed that you would be
 3    paid an hourly wage?
 4          A.   Yes.
 5          Q.   And what did you and Vincent say, what
 6    was the conversation like?
 7          A.   I was hired.  I would be getting paid
 8    this and that was it.
 9          Q.   Did you and Vincent discuss your
10    scheduling?
11          A.   I always had 40 hours.
12          Q.   I am going to ask for you to answer
13    the question that was posed.
14          A.   Okay.
15          Q.   The question was, did you and Vincent
16    discuss scheduling?
17          A.   Scheduling?  Yes.  You can say that.
18          Q.   What did you and Vincent discuss with
19    regards to scheduling?
20          A.   40 hours per week.
21          Q.   How did you learn that you had been
22    hired?
23          A.   There was a call to my phone or e-mail
24    stating that I was hired by Bestall.
25          Q.   Who was on the phone call?
```

```
 1                        PUGH
 2        A.  Who was on the phone call?  Illiya's
 3   partner, Vincent.
 4        Q.  And this is Vincent Ordioni?
 5        A.  I don't know his last name.
 6        Q.  Okay.  This is the same individual who
 7   you were speaking with regarding your
 8   compensation, with regards to your scheduling.
 9   Is that correct?
10        A.  Yes.
11        Q.  Was Illiya Meric present during any of
12   these conversations?
13        A.  Illiya was on the phone, like, a
14   conference phone call with me.
15        Q.  When was Illiya on the call with you?
16        A.  When I got first hired -- when I first
17   got hired.
18        Q.  When was that phone call?
19        A.  I don't know.
20        Q.  Was Mr. Meric part of the discussions
21   when you and Vincent were discussing your
22   payment?
23        A.  Vincent had to get the okay from
24   Illiya Meric.
25        Q.  Was Mr. Meric present during the
```

```
 1                      PUGH
 2     discussions when you and Vincent were discussing
 3     your compensation?
 4          A.   No.   He was not.
 5          Q.   Was Mr. Meric present when you and
 6     Vincent were discussing your scheduling?
 7          A.   No.   He was not.
 8          Q.   Mr. Pugh, did you receive an offer
 9     letter with regards to your employment at Bestall
10     Moda?
11          A.   I did receive one.
12               MR. MISRAHI:   Please mark this as
13     Defendant's Exhibit 3.
14               (Defendant's Exhibit 3, OFFER
15               LETTER, was marked for
16               identification.)
17               MR. MIZRAHI:    We are going to take
18     just a quick break.
19               (A recess was taken.)
20               MR. MIZRAHI:   Can you tell me what
21     the last question was?
22               (Requested testimony was
23               read.)
24          Q.   Mr. Pugh, you have in front of you a
25     document that's been marked as Exhibit 3.  It is
```

PUGH

1
2  an offer letter dated April 16, 2016.  Can you

3  please take a moment to familiarize yourself with

4  this document.

5        A.  April 15th.

6        Q.  Thank you.  You're correct.  Let the

7  record show that the document is dated April 15,

8  2016.  When you've finished familiarizing

9  yourself with it, just let me know.

10       A.  I am done.

11       Q.  Mr. Pugh, do you recognize this

12  document?

13       A.  No.

14       Q.  Mr. Pugh, have you ever seen this

15  document before today?

16       A.  No.

17       Q.  Mr. Pugh, is it your testimony here,

18  today, that you are seeing this document for the

19  first time?

20       A.  This document is not for the first

21  time.  I have seen this document before.

22       Q.  Where have you seen it?

23       A.  I've seen this document at my

24  attorney's office.

25       Q.  When did you see it first?

```
 1                         PUGH
 2         A.   I don't know.
 3         Q.   Was it on or around April 15, 2016?
 4         A.   No.
 5         Q.   Was it before then?
 6         A.   Before?  No.
 7         Q.   Was it after?
 8         A.   Was it after it?  It was after my
 9    employment with Bestall.
10         Q.   Mr. Pugh, does your name appear
11    anywhere on this document?
12         A.   My name is there.
13         Q.   Does your address appear anywhere on
14    this document?
15         A.   Yes.  It do [sic].
16         Q.   Is the address that is identified on
17    the top left corner of the document, your name
18    and your address?
19         A.   Yes.
20         Q.   Where else does your name appear on
21    this document?
22         A.   At the lower part of the document.
23         Q.   Mr. Pugh, what is this document?
24         A.   I don't know.
25         Q.   Is it your testimony here, today, that
```

```
 1                          PUGH
 2    you've seen this document before today.  Is that
 3    correct?
 4          A.  I've seen it before today, yes.
 5          Q.  And what is this document?
 6          A.  I don't know what this document is.
 7          Q.  Does this document contain any
 8    information regarding your employment with
 9    Bestall?
10          A.  I mean, it looks like it has
11    information pertaining to my employment with
12    Bestall, yes.
13          Q.  Does this document have any
14    information pertaining to your compensation with
15    Bestall?
16          A.  It looks like that.
17          Q.  And where does it have that
18    information?
19          A.  On the document.
20          Q.  Where on the document?
21          A.  I guess, the terms of the offer
22    includes the following and then it states it
23    right there.
24          Q.  And then it goes on to state your
25    hourly compensation, your weekly schedule, and
```

```
                              PUGH
```

1
2    circumstances regarding your termination should
3    you want to leave.  Is that accurate?
4           A.  Is it accurate?  I mean, yes.  It
5    looks like it is.
6           Q.  And then it also lists here
7    anticipated start date as Monday April 18, 2016.
8    Is that also accurate?
9           A.  I don't know.
10          Q.  Does the offer letter state that your
11   anticipated start date is Monday April 18, 2016?
12             MR. ABRAMS:   Hold on a sec [sic].  I
13   am objecting to the form of the question.
14          A.  Yes.
15             MR. ABRAMS:  You can answer.
16          A.  No.  I just don't know.  Like, I don't
17   know.  Like I said, I have seen this document
18   after I exited Bestall.
19          Q.  Does anybody else's name appear
20   anywhere on this document?
21          A.  No.
22          Q.  Do you see a name listed towards the
23   bottom of the document by one, Mr. Vincent
24   Ordioni?
25          A.  Yes.  I see that.
```

```
 1                        PUGH
 2          Q.  And is this the same Vincent who you
 3    were speaking with, with regards to your --
 4    before you started working at Bestall?
 5          A.  Yes.  Illiya's partner.
 6          Q.  Does Illiya Meric's name appear
 7    anywhere on this document?
 8          A.  Not that I know of.
 9          Q.  Is this offer letter accurate?
10          A.  No.
11          Q.  Why not?
12          A.  I didn't see this document when I was
13    employed.
14          Q.  Is this offer letter accurate?
15          A.  No.
16          MR. ABRAMS:   I am going to object to
17    the form of the question.   You can answer.
18          Q.  Does this offer letter contain any
19    inaccuracies?
20          MR. ABRAMS:   And I am going to object
21    to the form of the question, but you can answer
22    it.
23          Q.  Please answer the question.
24          A.  I didn't see this document when I was
25    employed.
```

```
 1                        PUGH
 2           Q.   Mr. Pugh, does this document contain
 3      any inaccuracies?
 4           A.   It looks like it.
 5           Q.   Where?
 6           A.   Where?   I have never seen all of these
 7      words on the document before.   I can't point out
 8      where, but this is not the document that they
 9      gave me.
10           Q.   Mr. Pugh, where are the inaccuracies
11      that you are alleging exist in this document?
12           A.   I told you already.   This is not the
13      document that they gave me.
14           Q.   How is it different from the one they
15      gave you?
16           A.   Because I don't remember it being this
17      much words.   I have -- like, I can remember
18      things.   And this is not it.
19           Q.   How were the words different?
20           A.   Because it was shorter.   It was like,
21      not even all of these words.   It was just very
22      short, simple, neat, done.
23           Q.   So is it your testimony here, today,
24      that you were provided an offer letter before you
25      started to work at Bestall Moda?
```

```
 1                          PUGH

 2           A.   I was.

 3           Q.   When were you provided that document?

 4           A.   It had to be in April.

 5           Q.   That would be on or around April 15,

 6      2016?

 7           A.   It could have been those dates, yes.

 8           Q.   Do you have a copy of that offer

 9      letter?

10           A.   I don't.

11           Q.   How was that offer letter presented to

12      you?

13           A.   On a table.  I looked through it.  I

14      signed the bottom of the document and then, I

15      gave it back to Vincent.

16           Q.   Who was in the room when you signed

17      the offer letter?

18           A.   Vincent.

19           Q.   Where did this take place?

20           A.   At Bestall Moda, Chelsea.

21           Q.   Was Mr. Illiya Meric present when you

22      had executed this offer letter?

23                MR. ABRAMS:   I am going to object to

24      the form of the question.

25           Q.   Do you recall if Mr. Illiya Meric was
```

                            PUGH

1
2    present when you had executed that offer letter?

3          A.   No.

4          Q.   No, do you recall if he was, or no, he

5    wasn't present?

6          A.   No.  I don't recall he was.

7          Q.   So he may not have been there?

8          A.   Yes.

9          Q.   Did the offer letter that you had

10   received contain information with regards to your

11   compensation?

12         A.   Yes.

13         Q.   Is the information regarding your

14   compensation the same or different from this

15   offer letter that you have in front of you today?

16         A.   This document is flawed.  So I can't

17   really inform you about that.

18         Q.   Does this document contain information

19   with regards to your hourly compensation?

20         A.   It looks like it.

21         Q.   Okay.  Is the information with regards

22   to your hourly compensation the same or different

23   from the information that you were given when you

24   first started working?

25         A.   I don't know.

```
1                          PUGH
2           Q.   So it could have been the same?
3           A.   It could have.
4           Q.   Does the information contained in this
5    document discuss anything with regards to your
6    scheduling?
7           A.   I mean, it is right there on the
8    paper.
9           Q.   It does, doesn't it?
10          A.   Yes.
11          Q.   Is the information presented in this
12   document the same or different from the
13   information that you were given when you had
14   first started working at Bestall Moda?
15          A.   I know I was working 40 hours a week.
16          Q.   And that was the same information that
17   was presented in this document?
18          A.   Yes.
19          Q.   Can you please describe your duties
20   and responsibilities at Bestall Moda?
21          A.   I was operations.  Operations, I mean,
22   basically is under the CEO.
23          Q.   What was your official title at
24   Bestall Moda?
25          A.   Operations manager.
```

```
1                         PUGH
2          Q.   And what did you do as an operations
3     manager?
4          A.   Everything that the CEO did and more.
5          Q.   So you were acting as CEO for Bestall
6     Moda?
7          A.   It's right under the CEO.  I worked
8     side by side with them.
9          Q.   Can you walk me through, like a normal
10    day as an operations manager?
11         A.   Opening the store, transactions,
12    prepping, their facebook website, accounts, et
13    cetera.
14         Q.   So on a normal day you would open the
15    store, what else do you do?
16         A.   Accounts.
17         Q.   What does that mean?
18         A.   Facebook accounts, instagram, et
19    cetera.
20         Q.   Beside opening the store and besides
21    --
22         A.   Selling.  Taking customers
23    information.  Doing transactions.
24         Q.   Besides opening the store, helping
25    customers with sales, assisting with the
```

```
 1                      PUGH
 2    companies facebook, did you have any other duties
 3    and responsibilities?
 4           A.   There were several.
 5           Q.   What else?
 6           A.   Managing their team.  A ton of things.
 7           Q.   What else?
 8           A.   What else?  A ton of things.  Like
 9    helping them out with getting income, networking.
10           Q.   Besides opening the store, helping
11    customers with transactions, managing a team,
12    assisting with facebook and networking.  Were
13    there any other duties and responsibilities that
14    you had?
15           A.   Going above and beyond so their
16    company can be very successful.
17           Q.   In what way?
18           A.   In what way?  Moneywise.  I mean --
19           Q.   In what ways did you go above and
20    beyond?
21           A.   Bringing in customers, clienteling,
22    networking, et cetera.
23           Q.   What was your weekly schedule at
24    Bestall?
25           A.   40 hours plus.
```

```
1                          PUGH
2          Q.  At what time would you typically
3     arrive for work?
4          A.  If business is doing good 10, 11
5     o'clock.
6          Q.  11 o'clock?
7          A.  10 or 11 o'clock.
8          Q.  So sometimes 10 o'clock and sometimes
9     11 o'clock?
10         A.  Yes.
11         Q.  What time would you typically leave
12    for work?
13         A.  Eight p.m. was the time frame that I
14    should be leaving from work, but if business is
15    slow, then seven.  If business is doing great,
16    then, obviously, I would stay open until nine.
17         Q.  So what time would you say you would
18    typically leave for work?
19         A.  Eight o'clock is always the due date
20    for me to leave work.
21         Q.  Is that the time you would typically
22    leave for work, around eight o'clock?
23         A.  Yes.
24         Q.  Okay.  So your weekly schedule was
25    either around 10 a.m. or 11 a.m. to around eight
```

PUGH

1
2  p.m.?

3         A.  Yes.

4         Q.  Mr. Pugh, what time did the business
5  open?

6         A.  What time did the business open?  10
7  or 11 o'clock.

8         Q.  On what days did it open at 10 a.m.?

9         A.  Monday through Friday.

10        Q.  On what days did it open at 11 a.m.?

11        A.  Sunday.

12        Q.  And what about Saturdays?

13        A.  Saturday's 10 a.m.  Saturdays is
14  always a busy day for retail.

15        Q.  So the business was open starting at
16  10 a.m. from Monday through Saturday and then 11
17  a.m. on Sundays?

18        A.  Yes.  You can say that.

19        Q.  Mr. Pugh, did you open the store every
20  day?

21        A.  Yes.  I was the one that always worked
22  every day.

23        Q.  Were you the one that opened the store
24  every day?

25        A.  Yes.

```
1                          PUGH
2          Q.  Can you describe the opening
3     procedures for me?
4          A.  The opening procedures, unlocking the
5     door, turning on the lights, making sure the
6     ambiance is well presentable.  Getting the
7     register, counting the drawer.  Making sure our
8     stock is correct and prepped up for customers to
9     come in and basically buy from our company.
10         Q.  Was anybody else responsible for
11    opening the store besides you?
12         A.  We had key holders, yes.
13         Q.  Who else was responsible for opening
14    the store besides you?
15         A.  Who else?  Our sales team.
16         Q.  Who else opened the store, besides
17    you?
18         A.  Our sales team.  We had a sales team.
19         Q.  Who else was on the sales team?
20         A.  They are not here today, so I don't
21    feel like I want to give their information out.
22         Q.  Okay.  Mr. Pugh, I am going to ask,
23    unless your you attorney directly tells you not
24    to answer a question, you are going to have to
25    answer the question.
```

```
 1                        PUGH
 2        A.  Why do I have to answer the question?
 3   That is personal information.
 4        Q.  Because this is a deposition and the
 5   information that I'm seeking is relevant to the
 6   claims and defenses in this case.
 7             MR. ABRAMS:  Would you mind if I just
 8   have a chat with my client outside of the room?
 9             MR. MIZRAHI:  Not until the question
10   asked is answered.
11             MR. ABRAMS:  Fine.  Just trying to
12   help you.
13        A.  We had a sales team.
14        Q.  Who was on the sales team?
15        A.  I don't know.  I didn't hire them.
16        Q.  Excuse me?
17        A.  I don't know.
18        Q.  Do you know the identities of anybody
19   else who you were working with?
20        A.  I can talk for myself.
21        Q.  Right.  Did you work with anybody else
22   while you were at Bestall Moda?
23        A.  I was mostly there by myself.
24        Q.  Were you ever there with anybody else?
25        A.  Probably so.
```

```
 1                        PUGH
 2         Q.  Who were you there with?
 3         A.  Who was I there with?  A salesperson.
 4         Q.  Who?
 5         A.  Who?  I told you I don't feel
 6    comfortable presenting their name to you, because
 7    they are not here.
 8         Q.  You have to answer the question.
 9         A.  I already answered the question.  I
10    had a sales team.
11         Q.  It doesn't matter whether or not you
12    feel comfortable.
13         A.  Okay.
14         Q.  If I ask a question, you have to
15    answer it.  Again, I am going to respectfully ask
16    that you answer the question.  Can you tell me
17    the names of the persons who were on the sales
18    team?
19         A.  Jay.  He had a nickname, Jay.
20         Q.  Did you know Jay's full name?
21         A.  No.  I don't.
22         Q.  Was anybody else on the sales team?
23         A.  We had a sales team, yes.  So Gerald.
24         Q.  Do you know Gerald's first and last
25    name?
```

```
1                        PUGH
2          A.   No.  I don't.
3          Q.   Besides Jay and Gerald, who else was
4    on the sales team?
5          A.   That is about it.
6          Q.   Is it your recollection that there
7    were only two members of the sales team?
8          A.   Yes.
9          Q.   Okay.  I would like to remind you that
10   you are under oath, Mr. Pugh.
11         A.   I understand that.
12         Q.   So were you ever responsible for
13   closing the business?
14         A.   Yes.
15         Q.   On how many occasions did you close
16   the business?
17         A.   About five or six times a week.
18         Q.   So you closed the business five days a
19   week?
20         A.   I opened the business, I closed the
21   business five to six days a week.
22         Q.   Who would open and close the business
23   on the days you didn't?
24         A.   One of those employees.
25         Q.   And it would only either be Jay or
```

```
 1                         PUGH
 2    Gerald?
 3            A.   Yes.
 4            Q.   Can you please describe what Jay looks
 5    like?
 6            A.   No.  Because I don't remember.
 7            Q.   Can you please describe what Gerald
 8    looks like?
 9            A.   No.  Because I don't remember.
10            Q.   Was he tall, was he short?
11            A.   Don't remember.
12            Q.   Was he young, was he old?
13            A.   Don't remember.
14            Q.   I am going to ask that you try to
15    remember.
16            A.   I already tried and I don't remember.
17            Q.   What time did the business close?
18            A.   I told you.  Eight o'clock.
19            Q.   Can you please describe the closing
20    procedures for me?
21            A.   Cutting off the lights.  Counting the
22    money, getting receipts, texting Vincent and also
23    Illiya, the numbers for the day.  Locking the
24    door.  That is mostly it.
25            Q.   Did you perform any other work?
```

```
 1                        PUGH
 2         A.   Networking after I get off of work.
 3         Q.   You previously testified that you
 4    started working on or around April 15 of 2016?
 5         A.   That is what the paper says.
 6         Q.   Is that correct?
 7         A.   I said that is what the paper says.  I
 8    can't remember the date.
 9         Q.   Do you recall testifying today that
10    you started working on or around April 16, 2016?
11         A.   That is what the paper says, yes.
12         Q.   No.  I am not interested in knowing
13    what the paper says.  I am interested in
14    reminding you that you testified earlier today
15    that you started working --
16         A.   What do you mean about -- what are you
17    trying to say, because I don't understand the
18    question.
19         Q.   Do you recall testifying earlier today
20    that you started working --
21         A.   Testifying?  Can you be a little more
22    detailed about that word.
23         Q.   When you answer my questions, you are
24    providing testimony.
25         A.   Okay.  And?
```

```
                              PUGH
  1
  2            Q.  Do you recall testifying earlier that
  3    you started working around April 16th of 2016?
  4            A.  I agree to the date on the paper, yes.
  5            Q.  When did you stop working for Bestall
  6    Moda?
  7            A.  I don't remember the date, but,
  8    obviously it says May 2017.
  9            Q.  Is that accurate?
 10            A.  It should be, yes.
 11            Q.  Between April 2016 and May 2017, did
 12    you take any vacations?
 13            A.  Did I take any vacations?  No.
 14            Q.  No.  Did you travel anywhere for an
 15    extended period of time?
 16            A.  Now that I think about it, yes.  I
 17    actually did.
 18            Q.  Where did you go?
 19            A.  Atlanta.
 20            Q.  Atlanta.  Is that where you are from?
 21            A.  No.
 22            Q.  When did you go to Atlanta?
 23            A.  Maybe, September.  Maybe.
 24            Q.  So that would be September of 2016?
 25            A.  Possibly.
```

```
 1                         PUGH
 2          Q.   How long were you there for?
 3          A.   Three days.
 4          Q.   Did you take any other extended
 5   periods of time off of work between 2016 and
 6   2017?
 7          A.   No.  Never.
 8          Q.   Michael, did you ever work in excess
 9   of 40 hours per week during your employment at
10   Bestall?
11               MR. ABRAMS:   If you could refer to my
12   client in more respectful terms, I would
13   appreciate it.  His name is Mr. Pugh or you can
14   call him sir.  And we will do the same courtesy
15   as referring to you as mister, or Mr. Mizrahi.
16               MR. MIZRAHI:   Sorry.
17          Q.   Mr. Pugh, did you ever work in excess
18   of 40 hours per week, at any point, during your
19   employment?
20          A.   Of course, I did.
21          Q.   On how many instances?
22          A.   Most of the time.  And I would like to
23   ask why you keep on saying April 16?
24               MR. ABRAMS:   All right.  Sir, you
25   don't get to ask him questions.  You just answer
```

```
                            PUGH
 1
 2    his questions as best you can.  That is all you
 3    have to do.  Okay.  Why he is doing what he is
 4    doing, is not your concern.  Okay?
 5              THE WITNESS:  Okay.
 6         Q.  Mr. Pugh, on how many instances did
 7    you work in excess of 40 hours per week?
 8         A.  Most of the time.
 9         Q.  Do you recall a number?
10         A.  No.  I don't.
11         Q.  You don't recall a number.  For each
12    week that you worked in excess of 40 hours a
13    week, approximately how many hours of overtime
14    did you work?
15         A.  Excuse me?
16         Q.  For each week that you believe that
17    you worked in excess of 40 hours, how many hours
18    over 40 did you work?
19         A.  I would say about an hour or two.
20         Q.  Per week?
21         A.  Yes.
22         Q.  Mr. Pugh, how many hours did you work
23    the week of April 15, 2016?
24         A.  I don't know.
25         Q.  And the week of April 25, 2016?
```

```
1                              PUGH
2           A.  I don't know.
3           Q.  Do you recall how many hours you
4    worked the week of May 2, 2016?
5           A.  I don't know.
6           Q.  Would it have been more than 40 or
7    less than 40?
8           A.  I worked 40 hours plus while I was
9    with company.  I do know that.
10          Q.  Is it your testimony here that you
11   worked in excess of 40 hours per week?
12          A.  Plus.
13          Q.  Is it your testimony that you worked
14   over 40 hours per week every week?
15          A.  I don't know.
16          Q.  So you are not sure?
17          A.  I am not sure.
18          Q.  Okay.
19              MR. MIZRAHI:   We are going to be
20   marking this as Defendant's Exhibit 4.
21              (Defendant's Exhibit 4, TIME
22              SHEETS, were marked for
23              identification.)
24          Q.  Mr. Pugh, I am handing you a series of
25   time sheets from April 18, 2016 through and
```

|  |  |
|---|---|
| 1 | PUGH |
| 2 | including May 1, 2018.  Please take a moment to |
| 3 | familiarize yourself with these documents |
| 4 | (handing). |
| 5 | A.  (Perusing.) Okay. |
| 6 | Q.  Mr. Pugh, do you recognize these |
| 7 | documents? |
| 8 | A.  Yes.  The documents are familiar. |
| 9 | Q.  What are they? |
| 10 | A.  It looks like total hours that I |
| 11 | worked per week. |
| 12 | Q.  Does your name appear anywhere on this |
| 13 | document? |
| 14 | A.  Yes. |
| 15 | Q.  It does.  Is this document a time |
| 16 | schedule for your weekly hours while employed by |
| 17 | Bestall Moda? |
| 18 | A.  It looks like it. |
| 19 | Q.  Is this time sheet an accurate |
| 20 | representation of your weekly schedule at |
| 21 | Bestall? |
| 22 | A.  I don't know. |
| 23 | Q.  You can take a moment to review it. |
| 24 | A.  I already reviewed it. |
| 25 | Q.  Is this document an accurate |

```
 1                        PUGH
 2   representation of the hours that you had worked?
 3        A.   It could be.
 4        Q.   All right.  To the best of your
 5   knowledge here, today, does this document contain
 6   any inaccuracies?
 7        A.   I don't know.
 8        Q.   So it is accurate?
 9        A.   I don't know if it is accurate.
10        Q.   According to the document, it states
11   that you were working the week of April 18th a
12   total of 28 hours per week.  Is that information
13   accurate?
14        A.   I don't know.
15        Q.   It could be accurate?
16        A.   It could be.
17        Q.   Okay.  And according to this document,
18   for the week of April 25, 2016, you worked a
19   total of 38 hours.  Is that also accurate?
20        A.   It could be.
21        Q.   Okay.  How many hours did you work the
22   week of April 25th?
23        A.   I don't know.  We had a punch-in,
24   punch-out system, so --
25        Q.   Okay.  How many hours did you work the
```

```
 1                          PUGH
 2    week of April 18th?
 3              A.  It says on the paper 28.
 4              Q.  So you worked 28 hours the week of
 5    April 18th?
 6              A.  That is what it says on the paper,
 7    yes.
 8              Q.  Is that actually how many hours you
 9    had worked?
10              A.  I don't remember.  I don't recall.
11              Q.  According to the document, it states
12    that you worked 38 hours the week of May 2nd.  Is
13    that information correct?
14              A.  It could be correct.
15              Q.  How many hours did you work the week
16    of May 2, 2016?
17              A.  I don't recall.
18              Q.  Mr. Pugh, how many hours did you work
19    the week of May 9, 2016?
20              A.  I don't recall.
21              Q.  How many hours did you work the week
22    of May 30, 2016?
23              A.  We had a punch-in system and that is
24    what I went by.
25              Q.  Okay.  So you went with the hours that
```

```
 1                        PUGH
 2   were whatever the -- you would punch in and you
 3   would punch out and that is how you kept track of
 4   your hours.  Is that accurate?
 5        A.  Yes.
 6        Q.  Are these the hours and the
 7   information that is listed here --
 8        A.  This is a paper printed and I have
 9   never seen so many hours put together like this.
10   So --
11        Q.  Mr. Pugh, does the information
12   contained in this time sheet, is the information
13   accurate?
14        A.  It could be.
15        Q.  Okay.  Mr. Pugh, according to the time
16   sheets, do you see that there are certain hours
17   that are highlighted?
18        A.  Yes.
19        Q.  Okay.  On how many instances do you
20   see numbers that are highlighted?
21        A.  Seven.
22        Q.  Mr. Pugh, the hours that are
23   highlighted, they all appear to be numbers in
24   excess of 40 hours per week.  Is that accurate?
25        A.  Yes.
```

```
 1                          PUGH

 2        Q.  So according to the punch-in and

 3   punch-out records, you had only worked overtime

 4   on seven instances.  Is that correct?

 5              MR. ABRAMS:   Object to the form of

 6   the question.

 7        Q.  You can answer.

 8        A.  Can you repeat your question or

 9   rephrase it please.

10        Q.  Yes.  According to this document, you

11   had only worked overtime on seven instances.  Is

12   that accurate?

13        A.  That is according to the document,

14   yes.

15        Q.  Is that information accurate?

16        A.  No.

17        Q.  Why not?

18        A.  Because I probably worked more hours

19   on the dates that say 38.

20        Q.  On what other dates did you work in

21   excess of 40 hours per week?

22        A.   I know after I closed the store I was

23   networking for them also.  That was just me

24   closing the store.  But I am still working for

25   them.
```

```
 1                          PUGH
 2          Q.  But the information in the time
 3   reports is accurate for you opening and you
 4   closing the store?
 5          A.  It could be.
 6          Q.  Is it?
 7          A.  It could be.
 8          Q.  It could be.  How much overtime do you
 9   believe that you worked from April '16 to May
10   '17?
11          A.  It could be more than what the paper
12   is stating.
13          Q.  But according to the document, you
14   only worked a total of 18 overtime hours?
15          A.  That is according to the document,
16   yes.
17          Q.  Is that accurate?
18          A.  It could be.
19          Q.  It could be.  But you believe it could
20   be more?
21          A.  It could be more.
22          Q.  How much more do you believe it could
23   be?
24          A.  I don't know.  Ten to eight, ten to
25   nine.  Could be more.
```

```
 1                        PUGH
 2          Q.   How did you come up with that number?
 3          A.   That is the time I opened, that is the
 4     time I closed.
 5          Q.   Excuse me?
 6          A.   That is the time I opened, that is the
 7     time I closed. So ten to eight.  You can
 8     calculate.  So it could be more than what the
 9     paper is stating.
10          Q.   Okay.  Mr. Pugh, how are you
11     compensated when you initially started working
12     for Bestall?
13          A.   What did you mean?
14          Q.   How were you paid?
15          A.   With a check.
16          Q.   Were you paid on an hourly basis?
17          A.   I was.
18          Q.   When you first started working, what
19     was your hourly compensation?
20          A.   It may have been ten.
21          Q.   Ten dollars per hour?
22          A.   Yes.
23          Q.   Did your rate of pay ever change?
24          A.   Yes.
25          Q.   When did it change?
```

```
 1                        PUGH
 2         A.   Maybe three to four months after.
 3         Q.   So maybe around July or June?
 4         A.   Yes.  In the summertime.
 5         Q.   What was your rate of pay from April
 6  2016 up until the date it changed?
 7         A.   It could have been ten dollars.
 8         Q.   What did it change to?
 9         A.   11.
10         Q.   Dollars per hour?
11         A.   Yes.
12         Q.   Mr. Pugh, do you believe you're
13  entitled to any unpaid compensation in this
14  lawsuit?
15         A.   Can you rephase your question?
16         Q.   Do you believe that you are owed any
17  unpaid compensation in this lawsuit?
18         A.   Yes.
19         Q.   Okay.  How much unpaid compensation do
20  you believe you are owed?
21         A.   I don't know.
22         Q.   Is it more than 100 dollars or is it
23  less than 100 dollars?
24         A.   I don't know.
25         Q.   On what basis do you believe you are
```

```
 1                        PUGH
 2   owed unpaid compensation?
 3           A.   I don't know.
 4           Q.   So you are not sure why you are owed
 5   unpaid compensation?
 6           A.   Yes.   They didn't pay me.
 7           Q.   What didn't they pay you?
 8           A.   The money that I worked for them.   I
 9   mean, if you work, you are owed money.
10           Q.   Is it your testimony here that you
11   weren't paid for the hours you had worked for
12   Bestall?
13           A.   Yes.
14           Q.   How much unpaid compensation were you
15   owed for the week of April 18, 2016?
16           A.   I don't know.
17           Q.   And how much unpaid compensation do
18   you believe you are owed for the week of April
19   25 --
20           A.   I don't know.
21           Q.   -- 2016.   What about May 2, 2016?
22           A.   I don't know.
23           Q.   And what about May 9, 2016?
24           A.   I don't know.
25           Q.   Do you know any amounts that you may
```

```
 1                         PUGH
 2   believe that you are owed for unpaid
 3   compensation?
 4           A.  I don't know.
 5           Q.  Okay.
 6               MR. MIZRAHI:  We would like to mark
 7   this as Defendant's Exhibit 5 for identification.
 8               (Defendant's Exhibit 5, WAGE
 9               STATEMENTS, were marked for
10               identification.)
11           Q.  Mr. Pugh, I am showing you a series of
12   wage statements beginning April 1, 2016 through
13   and including May 2, 2017.  Please take a moment
14   to familiarize yourself with these documents.
15           A.  (Perusing.) Okay.
16           Q.  Have you finished reviewing these
17   documents?
18           A.  I have.
19           Q.  Do you recognize these documents?
20           A.  I believe so.
21           Q.  What are they?
22           A.  It looks like pay stubs, or deposits,
23   or something like that.
24           Q.  Does your name appear anywhere on this
25   document?
```

```
 1                        PUGH
 2         A.  Yes.  It do [sic].
 3         Q.  What are these pay stubs -- the pay
 4   stubs, they have some information on them.  It
 5   looks like they list a rate of pay, they also
 6   list a total amount of hours worked and a total
 7   amount of gross income that you would have
 8   received.  Is that accurate?
 9         A.  Yes.
10         Q.  Is there any information contained in
11   these pay stubs that is inaccurate?
12         A.  Not that I know of.
13         Q.  Okay.  You received a pay stub.  How
14   often did you receive a pay stub while working at
15   Bestall?
16         A.  Not often.  It was deposited.
17         Q.  Did you have direct deposit set up?
18         A.  It looks like it.
19         Q.  Okay.  How often would you receive a
20   direct deposit?
21         A.  Once a month.
22         Q.  So once a month you would receive
23   direct deposit containing this information.  Is
24   that correct?
25         A.  It looks like it.
```

```
 1                      PUGH
 2         Q.  The information here, does it
 3   correctly list how much you were paid for the
 4   hours that you had worked?
 5         A.  Yes.
 6              MR. MIZRAHI:  I am going to mark this
 7   as Defendant's Exhibit 6 for identification.
 8              (Defendant's Exhibit 6,
 9              MINIMUM WAGE POSTER, was
10              marked for identification.)
11         Q.  Mr. Pugh, I am showing you a
12   photograph of a minimum wage poster that was
13   posted in the store.  Please take a moment to
14   familiarize yourself with the photograph.
15         A.  I did.
16         Q.  Do you recognize this poster?
17         A.  I recognize the poster, yes.
18         Q.  Where have you seen it before?
19         A.  At Bestall.
20         Q.  Where was it posted?
21         A.  In the bathroom.
22         Q.  Do you know what this poster is?
23         A.  Yes.  It tells you about your wages,
24   how much you are supposed to be getting, et
25   cetera.
```

```
 1                        PUGH
 2        Q.  Does it contain information about your
 3   overtime rights?
 4        A.  Not that I know of.  I don't know.
 5        Q.  But it is a poster of rights to
 6   employment in New York, right?
 7        A.  Yes.
 8        Q.  So it may contain information with
 9   regards to your overtime rights.  Is that
10   correct?
11        A.  Time and a half, yes.
12        Q.  It does contain information about your
13   overtime, yes?
14        A.  Yes.
15        Q.  And it contains, generally, other
16   information with regards to employee rights in
17   New York?
18        A.  It does.
19        Q.  It does?
20        A.  Yes.
21        Q.  Is it accurate to say that you saw
22   this poster on a daily basis?
23        A.  I saw the poster on a daily basis.
24        Q.  Okay.  At any point, during your
25   approximately one-year employment with Bestall,
```

```
 1                       PUGH
 2    did you ever experience any issues with your
 3    compensation?
 4            A.   Sometimes.
 5            Q.   Can you tell me about them?
 6            A.   They couldn't pay us.
 7            Q.   Did you ever raise these issues with
 8    your supervisor?
 9            A.   Several times.
10            Q.   Can you tell me about those
11    discussion?
12            A.   Why are we not getting paid on time.
13            Q.   Besides not getting paid on time, was
14    there any other issues with regards to
15    compensation?
16            A.   They would pay us in checks.
17            Q.   With regards to not being paid on time
18    and being paid in checks, were you experiencing
19    any other issues with regards to your
20    compensation?
21            A.   Yes.
22            Q.   What issues?
23            A.   Time and a half.  When I worked over
24    40 hours they only paid 11 dollars an hour,
25    maybe.  What else --
```

```
 1                          PUGH
 2          Q.  Is that it?
 3          A.  They would pay half of the money that
 4     they owe us.
 5          Q.  Is that it?
 6          A.  It could be, or it could be more.
 7          Q.  But to the best of your memory here,
 8     today, that's it?
 9          A.  Yes.
10          Q.  So you said that over the course of
11     your employment you've experienced issues with
12     your compensation, you weren't paid on time, and
13     you were being paid in checks, and you weren't
14     receiving your full overtime.  Is that accurate?
15          A.  Yes.
16          Q.  Did you ever bring these issues to the
17     attention of your supervisor?
18          A.  Several times.
19          Q.  Tell me about it.
20          A.  I would come to him, why are we not
21     getting paid on time.  They would want us to
22     stick it out.  After a while it was just
23     happening every month and to work monthly -- it's
24     just like, you are getting one check.  So you are
25     depending on that monthly check.
```

```
 1                          PUGH
 2          Q.  When did you first bring this to your
 3    supervisor's attention?
 4          A.  I can't remember.
 5          Q.  To the best of your ability, do you
 6    recall when you first brought it to your
 7    supervisor's attention?
 8          A.  After four months.
 9          Q.  So maybe around September, October is
10    when you first brought it to your supervisor's
11    attention?
12          A.  Probably so.
13          Q.  Whose attention did you bring this to?
14          A.  Illiya and also Vincent.
15          Q.  You brought this to your supervisor's
16    attention?
17          A.  Yes.
18          Q.  Who was your supervisor?
19          A.  Who was my supervisor?  Illiya and
20    Vincent.
21          Q.  Can you describe the conversations
22    that you would have with your supervisor?
23          A.  The conversations?  We should be
24    getting paid on time, we should be getting time
25    and a half, et cetera.
```

```
1                         PUGH
2          Q.  So maybe around September or October
3   is when you first brought this to your
4   supervisor's attention.  And you said that you
5   were experiencing some issues with getting paid
6   on time and not being paid overtime.  What would
7   they say?
8          A.  They wanted us to stick it out.  Like,
9   it was just dust off their shoulders.  Basically.
10         Q.  What did they say to you?
11         A.  They just wanted us to stick it out.
12  Everything is going to be okay, et cetera.  So it
13  really wasn't like a full-blown conversation, it
14  was just like, you have to either take it or
15  leave it.
16         Q.  How did these conversations take
17  place?
18         A.  How did the conversation take place?
19  What do you mean, I am speaking to you, you're
20  speaking to me.
21         Q.  No.  The conversations with your
22  supervisors, how did these conversations take
23  place?
24         A.  If the incident happened, then I would
25  bring up the topic.
```

```
 1                         PUGH
 2          Q.  You would bring it up to them in
 3     person?
 4          A.  Well, Illiya, obviously, had to be on
 5     the phone.  And Vincent was in person, yes.
 6          Q.  So you brought this to Vincent's
 7     attention in person and then you would sometimes
 8     speak to Illiya on the phone?
 9          A.  Speak to Illiya over the phone, yes.
10          Q.  Was Illiya on the phone every time
11     that you spoke to Vincent?
12          A.  Not every time, but the message was
13     relayed to him.
14          Q.  So was Illiya present during any of
15     these conversations with Vincent?
16          A.  When he flew into the United States,
17     yes.
18          Q.  When was this?
19          A.  Maybe around the holiday,
20     Christmastime.
21          Q.  So January of 2017, about?
22          A.  Christmas is in December.
23          Q.  So December or January of '16?
24          A.  Yes.
25          Q.  Was Illiya present during any of these
```

```
 1                        PUGH
 2   other conversations besides this one?
 3           A.  I don't remember.  I don't recall.
 4           Q.  Where was Illiya during this time?
 5           A.  What do you mean, what time?
 6           Q.  From April '16 to May '17, where was
 7   Illiya Meric?
 8           A.  In Europe or something like that.
 9           Q.  Was he there on a day-to-day basis?
10           A.  His wife was.
11           Q.  Was Illiya Meric in the store on a
12   day-to-day basis?
13           A.  Of course, not.  He was in Europe.
14           Q.  How many times did you meet Illiya
15   Meric?
16           A.  A couple of times.
17           Q.  How many?
18           A.  I don't recall, but I know it was over
19   ten times.
20           Q.  Over ten times.  You first met him in
21   December of 2017?
22           A.  It was around the holidays, because I
23   remember we all went to dinner.
24           Q.  Okay.  How many times did you
25   communicate with Illiya Meric beginning in April
```

```
1                         PUGH
2    of 2016 to May 2017?
3         A.   We communicated through messaging or
4    something like that.
5         Q.   Okay.  On how many instances did you
6    directly communicate with Mr. Meric?
7         A.   I would possibly say my whole entire
8    employment.
9         Q.   How many times per day did you speak
10   with Mr. Meric?
11        A.   Only at the end of the night.
12        Q.   Did you speak with him every night?
13        A.   Yes.
14        Q.   Did he speak with you?
15        A.   Yes.
16        Q.   What did he say, can you tell me about
17   these conversations?
18        A.   Great job.  If I made about 2,000,
19   3,000 dollars, et cetera, a day.
20        Q.   How would you communicate this
21   information to Mr. Meric?
22        A.   We was [sic] in a group chat.
23        Q.   Group chat.  What was the name of the
24   group chat that you were in?
25        A.   I don't remember.  I don't recall.
```

```
1                          PUGH
2           Q.   Was it WhatsApp?
3           A.   It could have been.  All I know is, we
4      was [sic] all in a group.
5           Q.   And you would text each other daily?
6           A.   Yes.
7           Q.   Okay.  Who else was in the group?
8           A.   My employees, their employees, his
9      wife, him, Vincent, et cetera.
10          Q.   When you say "your employees", who are
11     you referring to?
12          A.   The two employees that is on the
13     paper.
14          Q.   What were their names?
15          A.   Jay and Gerald.
16          Q.   What is Jay's last name?
17          A.   Don't remember.
18          Q.   You don't remember the name of your
19     employee?
20          A.   No.
21          Q.   Who hired Jay?
22          A.   Who hired Jay?  Illiya and Vincent.
23          Q.   Vincent hired Jay?
24          A.   Illiya and Vincent.
25          Q.   What was the name of your second
```

```
                              PUGH
 1
 2    employee?
 3          A.   Gerald.
 4          Q.   Gerald.  Do you know his full name?
 5          A.   No.  I told you that several times
 6    over.
 7          Q.   Why not?
 8          A.   Why not?  Because I moved on.
 9          Q.   How long did you work with them?
10          A.   A whole year.
11          Q.   You worked with these two individuals
12    for an entire year and you don't know their full
13    name?
14          A.   Yes.
15          Q.   Who hired the second individual?
16          A.   Illiya and Vincent.
17          Q.   How do you know that Illiya hired
18    these two individuals?
19          A.   Because I approached them with the
20    employees.  They have to do the paperwork with
21    Illiya and Vincent.  Vincent has to get the
22    confirmation from Illiya.
23          Q.   Mr. Pugh, who is Vincent Ordioni?
24          A.   Illiya's partner.
25          Q.   And what was he in relation to you?
```

```
1                          PUGH
2           A.   He was, I guess, the bigger boss.   The
3    higher boss.   The CEO.
4           Q.   Okay.   He was the person who presented
5    you with the offer letter.   Is that correct?
6           A.   Excuse me?
7           Q.   Was Vincent the individual who
8    presented you with your offer letter?
9           A.   Vincent, yes.
10           Q.   Was he the person that told you you
11    were first hired?
12           A.   Yes.
13           Q.   Was he the person that you spoke with
14    in regards to your compensation?
15           A.   Yes.
16           Q.   Was he the person that you spoke with,
17    with regards to your scheduling?
18           A.   Yes.
19           Q.   Did you speak with Mr. Meric regarding
20    your compensation before you started working?
21           A.   Everything had to be ran by Mr. Meric.
22           Q.   I am asking if you spoke with
23    Mr. Meric directly about your compensation,
24    before you started working?
25           A.   I didn't need to, but Vincent did.
```

```
 1                          PUGH
 2          Q.   Again, I just want to make sure the
 3     record is clear.  Did you speak to Mr. Meric
 4     directly about your compensation, before you
 5     started working?
 6          A.   No.
 7          Q.   Okay.  Did you speak with Mr. Meric
 8     directly about your scheduling --
 9          A.   No.
10          Q.   -- before you started working?
11          A.   No.
12          Q.   Did you speak with Mr. Meric, at all,
13     about your compensation --
14          A.   No.
15          Q.   -- during your employment?
16          A.   No.
17          Q.   Did you speak with Mr. Meric, at all,
18     directly during your employment with regards to
19     your scheduling?
20          A.   No.
21          Q.   If you had any issues with, like,
22     customers, who would you speak to?
23          A.   I would speak with myself.  I can
24     handle that.
25          Q.   Did you have to report anything to
```

```
 1                          PUGH
 2    your supervisor?
 3          A.   Not that I remember.
 4          Q.   Mr. Meric [sic], you previously stated
 5    that you stopped working at Bestall around May of
 6    2017, is that accurate?
 7          A.   Yes.
 8          Q.   Can you describe the circumstances
 9    leading up to your termination from the company?
10          A.   Mr. Meric and Vincent was on the
11    phone.  I heard them going back and fourth.  I
12    told Vincent that I was going on my thirty and
13    came back and Vincent informed me that --
14          Q.   I am sorry.  You were going on your
15    what?
16          A.   My thirty.  My thirty-minute break.
17          Q.   Okay.
18          A.   Vincent -- I came back from that and
19    Vincent informed me that he is sorry, but he has
20    to let me go.
21          Q.   How did you feel?
22          A.   How did I feel?  How does anybody
23    feel.
24          Q.   How did you feel?
25          A.   I mean, I moved on.  So how would
```

```
1                         PUGH
2    anybody feel when they get laid off.
3         Q.   Did Vincent tell you why you were
4    being terminated?
5         A.   After the fact, I did find out.
6    Vincent informed me that it was just business,
7    but I did overhear both of them arguing and
8    Vincent was defending me because, obviously,
9    Illiya is not in town and he doesn't know what is
10   going on in the U.S., but Illiya still wanted to
11   let me go.
12        Q.   So when you say he was out of town,
13   what do you mean?
14        A.   He was in Europe still.
15        Q.   He was in Europe, and he wasn't really
16   knowing what was going on in the U.S., do you
17   mean with the business?
18        A.   Yes.
19        Q.   Like the day-to-day stuff, he didn't
20   really know --
21        A.   Yes.  I handled that.
22        Q.   Okay.  So Illiya didn't really handle
23   the scheduling, did he?
24        A.   Everything had to go through him,
25   obviously, because he is the one that terminated
```

```
                              PUGH
 1
 2   me.  So --
 3        Q.  So, but you said that Vincent was the
 4   one who terminated you?
 5        A.  Vincent handed out the schedule, yes.
 6        Q.  No.  No.  I'm saying -- you said that
 7   Vincent was the one who terminated you.  He told
 8   you that you were terminated, right?
 9        A.  Vincent informed me that I was
10   terminated from Illiya.
11        Q.  Okay.  But he told you that you were
12   terminated, right?
13        A.  He informed me that Illiya wanted to
14   terminate me.  Yes, he did.
15        Q.  What did he say?
16        A.  Illiya would like to, basically, like
17   to let you go and it is just business.
18             MR. MIZRAHI:  I would like to mark
19   this as Defendant's Exhibit 7 for identification.
20             (Defendant's Exhibit 7,
21             RECOMMENDATION LETTER, was
22             marked for identification.)
23        Q.  Mr. Pugh, I am showing you a letter of
24   recommendation dated May 2, 2017.  Just take a
25   moment to familiarize yourself with the document.
```

```
 1                         PUGH
 2          A.   Yes.  I remember this document.
 3          Q.   What is it?
 4          A.   A recommendation letter.
 5          Q.   Have you seen this document before?
 6          A.   Yes.  I have.
 7          Q.   Where have you seen this document?
 8          A.   I seen it when I was terminated.
 9          Q.   Did Vincent Ordioni write you a letter
10    of recommendation --
11          A.   Yes.  He did.
12          Q.   -- upon your termination?
13          A.   Yes.  He did.
14          Q.   Okay.  Did you ask Vincent to write
15    you a letter of recommendation?
16          A.   I did.
17          Q.   Can you tell me about it, just the
18    conversation you had with Vincent?
19          A.   The conversation was about -- he knew
20    I was wrongly terminated and he wanted to help
21    out as best as he could.  So he wrote me a
22    recommendation letter.
23          Q.   Why did you ask Vincent?
24          A.   Why did I ask Vincent?  Because
25    Vincent was there.  He is, obviously -- like I
```

```
 1                          PUGH
 2    said, he is Illiya's partner.  Me and him worked
 3    side by side with each other so I asked him, hey,
 4    can you write me a recommendation letter because
 5    he knows what was going on with the company in
 6    the U.S., Illiya was always in Europe.
 7          Q.  Right.  You asked Vincent because he
 8    was the one who knew what was going on with the
 9    business in the U.S., right?
10          A.  In the U.S..  just like I knew what
11    was going on in the U.S. with the business.
12          Q.  Okay.  Did you ask him because he was
13    the one who knew you?
14          A.  No.  Of course not.  This is business.
15          Q.  No.  I am saying, did you ask him
16    because he was more familiar with your work?
17          A.  You didn't ask that before, but yes.
18    I did ask him because he knew how good of a
19    person I am on the floor.
20          Q.  And he would also know your schedule,
21    like, if you were on time, if you were not on
22    time or just, you know --
23          A.  I mean, I can't answer that question.
24          Q.  Okay.  The letter of recommendation,
25    it states that you're dependable.  Is that
```

```
1                         PUGH
2    correct?
3          A.   That is correct.
4          Q.   What do you think he was referring to?
5          A.   Making sure his company stays afloat
6    in the U.S.
7          Q.   Do you think that would mean showing
8    up to work when you needed to?
9          A.   Every single day.
10         Q.   Okay.  If you had any issues with your
11   schedule, who would you go to?
12         A.   There was no issues with my schedule,
13   because I always worked 40 hours.
14         Q.   Even if there were any times that
15   maybe you had to leave early or had leave late?
16         A.   There was none.
17         Q.   What about if you ever had to go, you
18   know, on vacation or take an extended trip?
19         A.   It would get spoken by -- well, spoken
20   to Vincent and Vincent would relay the message to
21   Illiya.
22         Q.   How do you know that Vincent would
23   relay the message to Illiya?
24         A.   Because I was there.
25         Q.   Where were you?
```

```
 1                         PUGH
 2          A.   In the office.
 3          Q.   At sometime during your employment,
 4    you took a trip to Atlanta, right?
 5          A.   Yes.
 6          Q.   Did you have a conversation with your
 7    supervisor about the trip?
 8          A.   Yes.  Of course.
 9          Q.   Who did you have a conversation with?
10          A.   Vincent and Illiya relayed the
11    message -- I mean, Vincent relayed the message.
12          Q.   I just want to make sure the record is
13    clear.  Who did you have a conversation with?
14          A.   Vincent.
15          Q.   Vincent Ordioni?
16          A.   I don't know his last name.
17          Q.   What did you tell him?
18          A.   I am going to Atlanta, or can I take
19    these days off, I mean.
20          Q.   So you asked him for permission if you
21    could take the time off?
22          A.   Yes, of course.  Out of respect, this
23    is their business.
24          Q.   Right.  And what did he say?
25          A.   He had to get confirmation from
```

```
 1                          PUGH
 2   Illiya.
 3          Q.   Is that what he said?
 4          A.   Yes.  Of course.
 5          Q.   What did he say, do you remember
 6   exactly what he said?
 7          A.   I just told you what he said.  He had
 8   to get confirmation from Illiya and he would get
 9   back to me.
10          Q.   How did you have this conversation
11   with Vincent?
12          A.   Face-to-face.
13          Q.   Okay.  If you ever, hypothetically,
14   had any issues with your schedule, who would you
15   speak to?
16          A.   I can't answer that question.
17          Q.   Hypothetically speaking, if you ever
18   had an issue --
19          A.   I can't answer that question, because
20   it never happened.
21          Q.   No.  I'm saying if it had happened, if
22   there was an emergency?
23          A.   The CEO, obviously.
24          Q.   Who was that?
25          A.   Vincent and Illiya.
```

```
 1                    PUGH
 2        Q.  No.  But who would you speak to?
 3        A.  Who would I speak to?  Illyia.  I
 4   mean, Vincent and Illiya.
 5        Q.  How would you speak to Illiya?
 6        A.  Either through Vincent, or over the
 7   phone as a conference, or through his wife.
 8        Q.  But I mean directly, who would you
 9   speak to directly?
10        A.  Directly, obviously Vincent, because
11   he was in the United States.
12        Q.  So if there were any issues, either
13   real or hypothetical, with your schedule, you
14   would have direct conversations with Vincent?
15        A.  Correct.
16        Q.  Because Vincent was like the
17   day-to-day guy, right?
18        A.  He was here in the United States just
19   as well as I was.
20        Q.  Yes.  He was right there with you.  He
21   was working right next to you.  He was at the
22   store, correct?
23        A.  Yes.  And when Illiya flew in, he was
24   there right next to me.  He was with me when we
25   would speak, et cetera.
```

```
 1                        PUGH
 2          Q.  You previously mentioned that you had
 3     some coworkers that you worked with at Bestall,
 4     right?
 5          A.  Yes.
 6          Q.  How many coworkers did you have?
 7          A.  Two.
 8          Q.  Besides the two coworkers, did you
 9     have any other coworkers?
10          A.  I can't remember.
11          Q.  To the best of your recollection,
12     today, who else worked with you at Bestall Moda?
13          A.  I told you, two.
14          Q.  Who were they?
15          A.  Who were they?  Gerald and Jay.
16          Q.  When did you first meet Gerald?
17          A.  Don't remember.
18          Q.  Was it before you started working or
19     was it after you started working?
20          A.  He came after.
21          Q.  It was after you started working at
22     Bestall?
23          A.  No.  He came after.
24          Q.  So you met him after you started
25     working at Bestall?
```

```
 1                         PUGH
 2         A.   Yes.
 3         Q.   Okay.  And Jay, did you meet him
 4    before or after you started working at Bestall?
 5         A.   After I started working at Bestall.
 6         Q.   When did you start working at Bestall?
 7         A.   I don't remember.
 8         Q.   Around what time?
 9         A.   I don't remember.
10         Q.   Was it in 2016?
11         A.   It was obviously the same year I was
12    there, because I met them.
13         Q.   Was it in 2017 or 2016?
14         A.   It says a year on the paper.  So a
15    whole year.  That's when I met them.
16         Q.   I am sorry.  When did you first meet
17    them?
18         A.   Don't remember.
19         Q.   You are not sure of the exact time?
20         A.   No.
21         Q.   Was it in April?
22         A.   Don't remember.
23         Q.   Was it in May?
24         A.   Don't remember.
25         Q.   Was it during the summertime?
```

```
 1                          PUGH
 2          A.   Don't remember.
 3          Q.   Do you remember how they came to work
 4   at Bestall?
 5          A.   What do you mean?
 6          Q.   Do you recall how they started working
 7   at Bestall?
 8          A.   How did they start working at Bestall?
 9          Q.   Yes.
10          A.   Because, I and Vincent gave the okay.
11   It was translated to Illiya and that was mostly
12   it.  They started working for us.
13          Q.   Did they apply to work at Bestall?
14          A.   Yes.  Of course.
15          Q.   Okay.  Did you interview them?
16          A.   I did.
17          Q.   Did Vincent interview them?
18          A.   Yes.  He did.
19          Q.   Did they submit any documentation in
20   connection with their application?
21          A.   Excuse me?
22          Q.   Did either of these individuals submit
23   an information or documents --
24          A.   I have no idea.  I don't remember.
25          Q.   -- in connection with their
```

```
 1                        PUGH
 2    application?
 3              A.  I don't remember.
 4              Q.  Okay.  Did you ask them for anything?
 5              A.  Did I ask them?  Yes.  I told them to
 6    bring a resume and I appointed [sic] them to
 7    Vincent.
 8              Q.  What did they do at the company?
 9              A.  They were sales.  So they had to sell.
10              Q.  They were salesmen?
11              A.  Yes.
12              Q.  Besides these two individuals, were
13    there any other employees at the company
14    besides --
15              A.  I can't remember.
16              Q.  Okay.  Walk me through, like, a day
17    for these two individuals, what did they do?
18              A.  Just arrive, sell, and go home.
19              Q.  If there were any issues with a
20    customer, or with coming in late --
21              A.  I would handle that.
22              Q.  -- who did they report to?
23              A.  Me.
24              Q.  You.  Okay.  And would you give that
25    information to anyone else?
```

```
1                          PUGH
2          A.   Excuse me?
3          Q.   Would you give that information to
4     anyone else?
5          A.   What information?
6          Q.   With these two individuals?
7          A.   No.  Because I am good at what I do.
8          Q.   No.  No.  I'm saying, if they said
9     that they were coming in late, or if there were
10    issues with customers, would you give that
11    information to anyone else?
12         A.   To who?
13         Q.   To anyone.  Would you give that
14    information to anyone else?
15         A.   No.  Because I handle my business when
16    I am there.
17         Q.   So they reported directly to you?
18         A.   Yes.
19         Q.   So you didn't report it to Vincent?
20         A.   No.  That is something minor.
21         Q.   And you didn't report it to Illiya?
22         A.   Why would I?  Illiya is the CEO.
23         Q.   Right.  Like he wouldn't handle this
24    kind of --
25         A.   Of course not.
```

```
 1                          PUGH
 2           Q.  Can you remind me, again, how you were
 3      paid each pay period from Bestall?
 4           A.  Obviously from the paper, direct
 5      deposit.  Some months they gave us checks.  So I
 6      am obviously going to have to go through the
 7      dates and see if they are correct, because I did
 8      get paid in checks some months.
 9           Q.  Do you remember what those check
10      payments were?
11           A.  No.  I don't remember.
12           Q.  Were they for the full straight-time
13      hours that you had worked for that month?
14           A.  No.  Because they were manually
15      plugged in by the CEO and Vincent, as well.
16           Q.  I am sorry?
17           A.  It was plugged in manually by the CEO
18      and that's how we was [sic] paid.
19           Q.  What do you mean, plugged in?
20           A.  Manually, like on the computer.  He
21      worked 38 hours, or 41 hours, et cetera.
22           Q.  The checks that you are saying Vincent
23      gave you, those checks were compensating you for
24      your full straight-time hours worked, or did they
25      give you, like, some payment for your overtime?
```

```
 1                     PUGH
 2   Do you know what those checks were intended to
 3   compensate you for?
 4          A.   I don't understand the question.
 5          Q.   We can continue.
 6          A.   Thank you.
 7          Q.   Who told you that you were getting a
 8   raise when your rate of pay changed?
 9          A.   Vincent.
10          Q.   Can you tell me about the
11   conversation?
12          A.   I will be getting four percent of
13   their business.
14          Q.   Before, you told me that you had an
15   hourly rate that went from ten dollars an hour to
16   11 dollars an hour?
17          A.   After three months, they raised it to
18   11 dollars an hour and they added the four
19   percent of their business onto it.
20          Q.   Who told you that they were raising
21   your --
22          A.   Vincent.
23          Q.   In addition to the hourly rate, what
24   else did Vincent tell you?
25          A.   The four percent.  I would be owning
```

```
 1                         PUGH
 2    four percent of their business.
 3          Q.  Can you describe to me what that
 4    conversation was like?
 5          A.  It was just a straightforward
 6    conversation.  If you make the amounts of money
 7    that we need to receive, you will get four
 8    percent of our business.
 9          Q.  Do you remember the exact amount that
10    you had to sell per month to get that bonus?
11          A.  The exact amount, it was like in the
12    ten thousand range.
13          Q.  So if you sold ten thousand dollars or
14    more, they said you would receive --
15          A.  Four percent, yes.
16          Q.  Four percent of what?
17          A.  Of ten thousand.
18          Q.  Was it four percent of ten thousand or
19    was it four percent of anything above what you
20    sold, above ten thousand?
21          A.  No.  It was above.  It was, like, if I
22    hit ten plus above too.  So if I hit 11, four
23    percent, 12 four percent, et cetera.
24          Q.  Who communicated that information to
25    you?
```

PUGH

1

2       A.   Vincent discussed it with Illiya and

3   Vincent relayed the message.

4       Q.   I am going to just make sure the

5   record is clear.  I had asked who discussed this

6   information with you?

7       A.   Vincent.

8       Q.   Okay.  You previously stated that you

9   would report at the end of each day how much you

10  had made --

11      A.   Correct.

12      Q.   -- to Vincent.  Is that correct?

13      A.   No.  I didn't say to Vincent.  I said,

14  to the group.

15      Q.   In the group chat?

16      A.   Yes.

17      Q.   And do you still have the application

18  on your device?

19      A.   No.  I switched phones.

20      Q.   What kind of phone do you have?

21      A.   What kind of phone?  I have a Verizon

22  phone now.

23      Q.   What kind of phone?

24      A.   Verizon.

25      Q.   Is it an Apple or Samsung?

```
 1                            PUGH
 2           A.  No.  It is an android.
 3           Q.  It's an android.  Do you remember the
 4    name of the app that you used to communicate with
 5    the group?
 6           A.  No.  I don't.
 7           Q.  But it would be reasonable to believe
 8    that it would be the same app that your coworkers
 9    had and that Vincent had?
10           A.  You can ask Illiya.
11           Q.  It would be reasonable to believe that
12    they would have the app on their phone --
13           A.  I don't know.  I don't know.  I wasn't
14    in their phone.
15           Q.  There would be a record of how many
16    times that you communicated with Illiya.  It
17    would exist in that application, is that correct?
18           A.  I don't know.  Obviously, we spoke
19    every day.
20           Q.  Beside using the application, did you
21    speak with Mr. Meric in any other manner?
22           A.  Yes.  Of course.
23           Q.  How would you speak to him?
24           A.  Obviously through the phone with
25    Vincent on a conference call.  Because Vincent
```

```
 1                        PUGH
 2   was the only one that had the Europe number.
 3        Q.   So anytime you spoke with Mr. Meric,
 4   it was in the company of Mr. Vincent.  Is that
 5   correct?
 6        A.   Yes.  Yes.
 7        Q.   Did you ever speak to Mr. Meric
 8   directly?
 9        A.   In the app, yes.
10        Q.   Besides the app?
11        A.   Yes.  Just through the app.  And,
12   also, in person when he came to the United
13   States.
14        Q.   How many times did you meet Mr. Meric
15   in person?
16        A.   I said it was probably over ten times.
17        Q.   There were sporadic occasions he would
18   pop his head in the store and you would say, hi?
19        A.   Yes.  He would stay with us for the
20   whole day to see how the business was going.  I
21   would talk to him, play with his kids, speak with
22   his wife, et cetera.
23        Q.   Did you have closeout procedures at
24   Bestall?
25        A.   I believe so, yes.
```

```
 1                          PUGH

 2          Q.  Who told you about these closeout

 3     procedures?

 4          A.  Vincent.

 5          Q.  Did you have to speak with vendors as

 6     part of your employment with Bestall?

 7          A.  Who?

 8          Q.  Did you have to speak with vendors as

 9     part of your employment with Bestall?

10          A.  Yes.  I handled that as well.  Like

11     vendors for buying clothes?

12          Q.  Yes.

13          A.  Yes.  Of course.

14          Q.  Who told you how to speak with vendors

15     at Bestall?

16          A.  Vincent.

17          Q.  Were you responsible for collecting

18     invoices at Bestall?

19          A.  Invoices, what do you mean?

20          Q.  Invoices.  Like, if there were any

21     past amounts due that the company was owed, who

22     was responsible for -- were you responsible for

23     collecting those invoices?

24          A.  I don't know.  I can't remember.

25          Q.  Who would have been responsible for
```

```
 1                           PUGH
 2     collecting invoices?
 3               A.   Vincent, obviously.   Yes.
 4               Q.   And were you responsible for
 5     merchandising?
 6               A.   Yes.
 7               Q.   Who directed you on how merchandising
 8     was done at Bestall?
 9               A.   Nobody needed to, because I was
10     already trained on that.
11               Q.   So you did it independently?
12               A.   Yes.
13               Q.   So Mr. Vincent directed you on the
14     closeout procedures and then --
15               A.   He trained me.
16               Q.   He trained you?
17               A.   Straightforward, clean.   He is an
18     older guy, so he can't really be on the floor
19     with me like that.   So he trained me, one, two,
20     three on the computer and, like most of the stuff
21     that I knew in my head, I was already doing it
22     for them.
23               Q.   So everything that you learned,
24     everything that you were doing at Bestall, either
25     Vincent trained you or you had already known
```

                          PUGH

1   before you started working there?

2       A.   Correct.

3       Q.   Besides the federal litigation that we

4   are currently in, were you ever involved in any

5   other claims or proceedings?

6       A.   No.  Not that I know of.

7       Q.   Were you ever involved in any criminal

8   proceedings?

9           MR. ABRAMS:   I am going to -- hold on

10  a second.  You are asking him if he was involved

11  in criminal proceedings, like as a witness, a

12  party?

13      Q.   If you were ever involved in -- were

14  you ever involved in --

15          MR. ABRAMS:   You can ask him if he

16  was a witness in any criminal proceedings if you

17  want.  I will let you ask him that.

18          MR. MIZRAHI:  No. No.

19          MR. ABRAMS:  But I am directing him

20  not to advise if he was a defendant in a criminal

21  proceeding.

22      Q.   Were you ever involved in any criminal

23  proceedings?

24          MR. ABRAMS:   I am advising my client

25

```
 1                           PUGH
 2   to, when he answers that question, to limit it to
 3   situations where he was a witness in a
 4   proceeding, not where he was a defendant.  You
 5   can answer.
 6            A.  I don't have an answer to that.
 7                 MR. ABRAMS:   Maybe you can clarify it
 8   a little.
 9                 MR. MIZRAHI:  Let the record state
10   that plaintiff's counsel is improperly guiding
11   his client.
12        Q.  Were you ever involved in any criminal
13   proceedings?
14                 MR. ABRAMS:   I am just directing my
15   client not to answer.  Don't answer that.  If you
16   want to ask him if he was a witness in a
17   proceeding, I'm not going to direct him not to
18   answer.  You heard what the judge said.  You get
19   to ask him about convictions.  That is fine.
20        Q.  Have you ever been fired from a job
21   before, besides at Bestall?
22            A.  I don't recall.
23            Q.  You may have been?
24            A.  I may not have been.
25            Q.  You may have been terminated from an
```

                          PUGH

 1

 2   employment?

 3        A.   I may not have been.

 4        Q.   But you also may have been, right?

 5        A.   I don't recall.

 6             MR. MIZRAHI:   I am going to admit into

 7   evidence the following document.

 8        Q.   Vincent [sic], I am showing you --

 9        A.    My name is not Vincent.

10        Q.   Vincent [sic], I am showing you a

11   screen capture of your LinkedIn profile as of

12   February 26, 2019.

13             MR. ABRAMS:   Don't say anything.   I

14   am directing my client not to look at the

15   document.

16        Q.   Please look at the document.

17             MR. ABRAMS:   Don't look at it.   You

18   will address my client respectfully.   Okay.

19   That's just on that.   You want to call the judge

20   on that?   You will call him Mr. Pugh or sir, and

21   I will call you Mr. Mizrahi or sir, and you will

22   call me Mr. Abrams or sir.

23             MR. MIZRAHI:   What is the basis of you

24   instructing your client not to look at this

25   document?

```
 1                          PUGH
 2              MR. ABRAMS:   You will ask him to do
 3    so in a respectful way.  If you ask him to do it
 4    respectfully, if you say, Mr. Pugh or sir, there
 5    is no problem.  If you call him by someone else's
 6    name, if you call him Vincent, forget it.
 7         Q.   Mr. Pugh, I am showing you a screen
 8    capture of your LinkedIn profile as of February
 9    26, 2019.  Can you please take a moment to
10    familiarize yourself with the document.
11              MR. ABRAMS:   Go ahead.
12         A.   Okay.
13         Q.   Are you familiar with this, the
14    information presented in this document?
15         A.   This is a screen capture, so my
16    information could have changed.
17         Q.   As of February 26, 2019, did you
18    change your LinkedIn profile?
19         A.   Did I change my LinkedIn profile?  I
20    could have.
21         Q.   Did you?
22         A.   I could have.  I have a ton of
23    accounts.
24         Q.   To the best of your recollection,
25    today, did you change any of the information on
```

```
 1                          PUGH
 2    your LinkedIn profile --
 3             A.  I could have.
 4             Q.  -- from February 26?
 5             A.  I could have.  What is it, the 28th,
 6    27th, today?
 7             Q.  Yes.  Michael, I am showing you your
 8    LinkedIn profile --
 9                  MR. ABRAMS:   Don't say anything.
10    Don't look at it and don't say anything.
11             Q.  -- if you could take a moment to
12    familiarize yourself with the profile.
13                  MR. MIZRAHI:  Mr. Abrams, on what
14    basis are you instructing your client?
15                  MR. ABRAMS:   You have to address my
16    client respectfully.  I don't know how many times
17    I have to tell you this.  This is a federal court
18    proceeding.  If you want him to look at
19    something, you will call him by his last name.
20    You will say Mr. Pugh.  Don't call him by his
21    first name.  Do you want to call the judge on
22    this?
23                  MR. MIZRAHI:  No.  No.
24             Q.  Mr. Pugh, if I do call you by your
25    first name, please don't take it as a sign of
```

```
1                          PUGH
2    disrespect.  Mr. Pugh, I am showing you your
3    LinkedIn profile.
4              MR. ABRAMS:   You can look now.
5         Q.  If you could just take a moment to
6    familiarize yourself with the profile.
7         A.  I know my profile.
8         Q.  Can you please take a moment to
9    familiarize yourself with the profile.
10        A.  Do I have to?
11        Q.  Yes.
12             MR. ABRAMS:   You can look at it.
13   There is a phone here.
14             THE WITNESS:  That is his personal
15   phone.
16             MR. ABRAMS:   Well, if he wants to let
17   us look at it -- are we going to make this -- I
18   guess we can take a picture of the phone.
19        Q.  Mr. Pugh, if you could just
20   familiarize yourself with the profile.
21        A.  I don't need to, because it is my
22   profile.
23        Q.  I am asking you to and if you could
24   just take a moment to familiarize yourself.
25        A.  No.  I don't need to.  It is my
```

```
 1                        PUGH
 2   profile.
 3           MR. ABRAMS:   Well, do you have any
 4   questions for him?
 5           A.  Yes.  Like, why do I need to look at
 6   your personal phone?
 7           Q.  Is the information on your profile, as
 8   of today, is it accurate?
 9           A.  You just pulled it up today, so it
10   should be.
11           Q.  Okay.
12           MR. ABRAMS:   Sir, I have a right to
13   make a record of everything you show my client.
14           MR. MIZRAHI:  Sure.
15           MR. ABRAMS:   So just give me a minute.
16           MR. MIZRAHI:  No problem.
17           Q.  Mr. Pugh, is the information that is
18   presented on your profile, as of today, the same
19   or different from what was presented on your
20   profile on Exhibit 8?
21           A.  I don't know.  I didn't take a look.
22           Q.  You can take a look.
23           A.  I don't need to, because it is your
24   personal phone.
25           Q.  I am allowing you to and I am
```

```
 1                         PUGH
 2    directing you to.
 3           A.   You don't need to direct me.
 4           Q.   Mr. Pugh, again, I would like to
 5    remind you that you are under oath at a federal
 6    deposition.  So if I ask you a question, unless
 7    your attorney instructs you not to answer it, you
 8    have to answer it.
 9           A.   I am looking at Exhibit 8 and my
10    profile -- this is my name.  And I could have
11    changed my profile before you screen shot it.
12           Q.   Okay.
13           A.   Anything else?
14           Q.   Mr. Pugh, does your name appear
15    anywhere on this document?
16           A.   Yes.
17           Q.   Where does it appear?
18           A.   On the top.
19           Q.   And does this document list your
20    employment history?
21           A.   Not all of it.
22           Q.   Does it list some of your employment
23    history?
24           A.   It could have, yes.
25           Q.   What employment history does this
```

```
 1                      PUGH
 2   document list?
 3         A.   That I was operations manager at
 4   Bestall.
 5         Q.   Does this document list any other
 6   information with regards to your employment?
 7         A.   A couple, yes.
 8         Q.   What information does it contain?
 9         A.   Operations manager for Tiziano Zorzan
10   and fashion stylist for Purdy Girl.
11         Q.   Did you work as operations manager for
12   Tiziano Zorzan?
13         A.   Everywhere I was going I was working
14   as an operations manager.
15         Q.   Were you working as an operations
16   manager for Tiziano Zorzan?
17         A.   I was controlling one of his stores,
18   so yes.
19         Q.   Tell me about that job.
20         A.   It was the same thing as I did with
21   Bestall.
22         Q.   Can you describe what you did?
23         A.   The same thing that I did with
24   Bestall.
25         Q.   What did you do?
```

```
1                        PUGH
2           A.  The same thing I did with Bestall.
3           Q.  When did start working for Tiziano
4      Zorzan?
5           A.  It has the dates of September 2017 to
6      May 2018.
7           Q.  And were you working at Tiziano Zorzan
8      beginning in September of 2017?
9           A.  Excuse me?
10          Q.  Is that when you started working for
11     Tiziano?
12          A.  I could have, yes.
13          Q.  Yes.  That would have been while you
14     were also working at Bestall.  Is that correct?
15          A.  It could have been.
16          Q.  Okay.  Did you start working at
17     Tiziano Zorzan while you were also working at
18     Bestall?
19          A.  It could have been or it may not have
20     been.
21          Q.  But according to your LinkedIn
22     profile --
23          A.  According to it, like I was
24     calculating.  When I left Bestall I went to
25     Tiziano.
```

```
 1                     PUGH
 2         Q.  Were you working at Tiziano while you
 3    were working at Bestall?
 4         A.  Of course not.
 5         Q.  Why does the LinkedIn profile say that
 6    you were working there while you were also
 7    working at Bestall?
 8         A.  I was calculating.  And I don't
 9    remember the dates.  So I put what I thought I
10    knew.
11         Q.  When did you start working at Tiziano
12    Zorzan?
13         A.  I don't remember.  I don't recall.
14         Q.  Was it while you were working for
15    Bestall?
16         A.  Of course, it was not.  I only worked
17    for one company at a time.
18         Q.  How long were you working there for?
19         A.  Excuse me?
20         Q.  How long were you working there for?
21         A.  Probably a short period of time.
22         Q.  How long?
23         A.  Don't remember.  Don't recall.
24         Q.  Was it more than nine months or was it
25    less than nine months?
```

```
 1                      PUGH
 2        A.  No.  It may have been less than nine
 3   months.
 4        Q.  It would have been after you stopped
 5   working at Bestall?
 6        A.  Correct.
 7        Q.  So beginning in May 2017?
 8        A.  I don't remember.
 9        Q.  Or June of 2017?
10        A.  I don't remember.  But it was very --
11   like a short period of time that I was with
12   Tiziano.  Because things just wasn't there for
13   me.
14        Q.  Tell me about how your employment at
15   Tiziano came to an end.
16        A.  How did it come to an end?
17        Q.  Yes.
18        A.  We wasn't making money.  If I am not
19   making money, they're not making money.
20        Q.  Were you terminated from your
21   employment at Tiziano?
22        A.  I was not terminated.  I left.
23        Q.  What did you do afterwards?
24        A.  What did I do?  I went to a
25   restaurant.
```

```
1                          PUGH
2         Q.  Were you ever terminated from any
3    employment besides your employment from Bestall?
4         A.  No.  I am great at what I do.
5              MR. MIZRAHI:  We are just going to
6    take a quick break.
7              (A recess was taken.)
8              MR. MIZRAHI:  You are now on speaker
9    phone and we are now on the record.
10             THE CLERK:  Everyone is there.  Okay.
11   Hold on and I will put the Judge on.  Hold on.
12             THE COURT:  Good afternoon.  It is
13   Judge Schofield, again.
14             MR. MIZRAHI:  Good afternoon, Your
15   Honor.  This is Jason Mizrahi again from
16   Levin-Epstein & Associates, attorneys for the
17   defendant in the matter.
18             THE COURT:  Right.  I have my notes
19   from last time.  So I assume it is the same cap
20   [sic].
21             MR. MIZRAHI:  Thank you, Your Honor.
22   I am calling again, because we have encountered
23   another issue with regards to another line of
24   questioning that we would request your assistance
25   with.  Specifically, the line of questioning has
```

```
 1                          PUGH
 2    to do with the filing of the State Court
 3    Complaint that preceded the filing of this
 4    federal lawsuit.  Defendant's are seeking basic
 5    information regarding and surrounding the filing
 6    of the State Court Complaint that plaintiff is
 7    refusing to answer.  We are requesting that the
 8    court direct the plaintiff to answer questions
 9    and the line of questioning as it pertains to the
10    filing and the circumstances surrounding the
11    filing of the State Court Complaint.
12                 THE COURT:  And what is the relevance
13    of that to a claim or defense in the case?
14                 MR. MIZRAHI:  It has to do with the --
15    it is a fundamental question that we need to
16    establish to see what the claims and defenses of
17    this case are, to establish what is it that the
18    plaintiff is seeking to recover in this case, to
19    establish if there's a possibility --
20                 THE COURT:  Wait.  I don't understand,
21    but that is probably because I am not looking at
22    the docket sheet.  Is the State Court Complaint
23    the only operative complaint here and now, or is
24    it something --
25                 MR. MIZRAHI:  To give you a background
```

```
 1                         PUGH
 2   there is a State Court Action that was filed in
 3   2017 with identical allegations than the
 4   allegations that were alleged in the Federal
 5   Complaint.
 6             THE COURT:  Right.
 7             Mr. Mizrahi:  So we are seeking to
 8   continue with the line of questioning on the
 9   basis of a defense of res judicata that we would
10   ultimately be exploring and just generally trying
11   to establish what the plaintiff's contemplated
12   recovery is in this case, because if he would
13   recover in one case, he would ultimately recover
14   in this case and his claims would be mute.
15             THE COURT:  Those all sound like legal
16   questions to me.  I mean, the State Court Action,
17   is what it is.  If there is a judgment in that
18   case, then you can make or raise res judicata
19   argument and the legal answer is what the legal
20   answer is, and what the plaintiff contemplates
21   isn't relative to that.
22             MR. MIZRAHI:  Respectfully, Your
23   Honor, there's one line of questioning that is
24   not a legal question.  It is a factual question
25   that was left unanswered.  And  the question was
```

<pre>
 1                           PUGH
 2   whether or not the plaintiff had instructed his
 3   attorney to file the State Court action in 2017?
 4               THE COURT:  And how is that relevant
 5   to a claim or defense in this action?
 6               MR. MIZRAHI:  Because if he had not
 7   instructed his attorney to file this lawsuit, it
 8   is directly relevant to the defense in this case.
 9               THE COURT:  So let's say he says,
10   whatever it is you're hoping in your wildest
11   dreams he says, which is what?  I presume -- and
12   you can excuse the plaintiff here if you would
13   like from the room so we can talk about this.
14               MR. MIZRAHI:  Yes.  I would like to,
15   Your Honor.
16               MR. ABRAMS:  All right.  Step out,
17   sir.
18               MR. MIZRAHI: All right, Your Honor.
19               THE COURT:  Okay.  So you are
20   presuming that he is going to say, no I didn't
21   instruct my attorney to do this, he just did it
22   on his own, or something like that?
23               MR. MIZRAHI: I am only interested in
24   hearing the truth, Your Honor.
25               THE COURT:  No.  I understand that.
</pre>

```
 1                          PUGH
 2    But one thing he says he is going to support the
 3    argument or defense you have and other things he
 4    says, will not.  I still don't understand what
 5    your defense is.  So tell me what testimony you
 6    are seeking to elicit and how that would be
 7    helpful to a defense.
 8              MR. MIZRAHI:  We are seeking to
 9    illicit testimony that shows that he did not in
10    fact instruct his attorney to file the State
11    Court action and that he is attempting to
12    litigate this case on the basis of having my
13    clients incur substantial legal fees in order to
14    defend themselves.  In which case, there is bad
15    faith argument that we would have to raise and we
16    would have to preserve our rights on that basis.
17              THE COURT:  I don't -- I don't think
18    him saying that one way or the other advances
19    that defense.  I am not sure whether that is a
20    defense in this action, but even assuming that it
21    is, the fact that the two exist  and that your
22    client is incurring substantial expenses because
23    of the duplicity of actions seems to me a basis
24    for you to argue whatever you want to argue.  And
25    that him saying whether the lawyer instructed him
```

```
1                            PUGH
2    or not, or what their communications were, I
3    mean, this is, as I think about it, this is a
4    privileged communication between the lawyer and
5    the client for the purpose of giving or receiving
6    legal advice.  So I will not allow questioning of
7    that sort and you can proceed with or conclude
8    with your deposition.
9              MR. MIZRAHI:  Okay.
10             THE COURT:  Thank, you counsel.
11             MR. MIZRAHI:  Thank you.
12             MR. ABRAMS:   Thank you.  Shall I
13   bring him back?
14             MR. MIZRAHI:   Yes.  No further
15   questions.
16             MR. ABRAMS:   I don't have any cross
17   examination questions, but I do -- my client and
18   I reserve the right to review a copy of the
19   transcript and make corrections.
20             MR. MIZRAHI:  The defendant in this
21   case would like to state for the record that they
22   would also like to reserve their right to reissue
23   the fact of discovery as it pertains to new
24   information uncovered over the course of today's
25   deposition.  If, necessary, conduct future
```

1                          PUGH

2    depositions of Mr. Pugh and/or his associates at

3    the company.

4                    (Time noted: 12:49 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A C K N O W L E D G M E N T

 2

 3   STATE OF NEW YORK    )

 4                          :SS

 5   COUNTY OF            )

 6

 7          I, MICHAEL PUGH, hereby certify that I

 8   have read the transcript of my testimony taken

 9   under oath in my deposition of February 28, 2019;

10   that the transcript is a true, complete and

11   correct record of my testimony, and that the

12   answers on the record as given by me are true and

13   correct.

14

15

16            _____

17                      MICHAEL PUGH

18

19

20   Signed and subscribed to before me,

21   this day _____  of _____, 2019.

22

23

24   _____

25   Notary Public, State of _____
```

```
 1              C E R T I F I C A T E

 2

 3          I, NICOLE L. BASILE, a Notary Public

 4   within and for the State of New York do hereby

 5   certify that the foregoing examination of was

 6   taken before me on the 28 day of February, 2019.

 7   The said witness was by me duly sworn before

 8   the commencement of their testimony.

 9          The said testimony was taken

10   stenographically by myself and then transcribed.

11   The within transcript is a true record of the

12   said testimony.

13          I am not connected by blood or marriage

14   with any of the said parties, nor interested

15   directly or indirectly in the matter in

16   controversy, nor am I in the employ of any of the

17   counsel.

18          IN WITNESS WHEREOF I have hereunto set

19   my hand this 14th day of March, 2019.

20

21

22

23   _Nicole L. Basile_

24   _____

25   NICOLE L. BASILE
```

```
1              *** ERRATA SHEET ***

2        ELLEN GRAUER COURT REPORTING CO., LLC
          126 East 56th Street, Fifth Floor
3              New York, New York 10022
                    212-750-6434
4

5   NAME OF CASE:  PUGH vs. BESTALL MODA
    DATE OF DEPOSITION:  February 28, 2019
6   NAME OF WITNESS:  MICHAEL PUGH

7   PAGE  LINE  FROM        TO          REASON

8   _____|_____|_____|_____|_____

9   _____|_____|_____|_____|_____

10  _____|_____|_____|_____|_____

11  _____|_____|_____|_____|_____

12  _____|_____|_____|_____|_____

13  _____|_____|_____|_____|_____

14  _____|_____|_____|_____|_____

15  _____|_____|_____|_____|_____

16  _____|_____|_____|_____|_____

17  _____|_____|_____|_____|_____

18  _____|_____|_____|_____|_____

19  _____|_____|_____|_____|_____

20  _____|_____|_____|_____|_____

21                          _____

22  Subscribed and Sworn before me

23  this _____ day of _____, 2019.

24  _____       _____

25  Notary Public               My Commission Expires:
```

**[**

**[sic] (14)**
10:18;13:8;19:18;
33:15;35:12;65:2;
74:22;75:4;79:4;91:6;
93:18;103:8,10;
113:20

**A**

**ability (3)**
6:25;7:14;70:5
**above (6)**
42:15,19;95:19,20,
21,22
**ABRAMS (55)**
8:15,18;9:4,8,13,
23;10:4,18;11:9;
14:18;15:13,18,23;
18:9,13,22;20:17,23;
22:8;23:25;24:6,18;
35:12,15;36:16,20;
38:23;46:7,11;52:11,
24;59:5;101:10,16,20,
25;102:7,14;103:13,
17,22;104:2,11;105:9,
13,15;106:4,12,16;
107:3,12,15;116:16;
118:12,16
**According (12)**
26:8;56:10,17;
57:11;58:15;59:2,10,
13;60:13,15;110:21,
23
**accounts (4)**
41:12,16,18;104:23
**accurate (25)**
35:3,4,8;36:9,14;
51:9;55:19,25;56:8,9,
13,15,19;58:4,13,24;
59:12,15;60:3,17;
65:8;67:21;69:14;
79:6;107:8
**acting (1)**
41:5
**action (9)**
11:4,15;26:9;115:2,
16;116:3,5;117:11,20
**actions (1)**
117:23
**actual (1)**
9:10
**actually (2)**
51:17;57:8
**added (1)**
94:18
**addition (1)**
94:23
**address (7)**
5:7;11:10;33:13,16,
18;103:18;105:15

**administer (1)**
4:10
**admit (2)**
12:5;103:6
**advances (1)**
117:18
**advice (1)**
118:6
**advise (1)**
101:21
**advising (1)**
101:25
**afloat (1)**
84:5
**afternoon (2)**
113:12,14
**afterwards (1)**
112:23
**again (10)**
13:24;15:23;22:19;
47:15;78:2;93:2;
108:4;113:13,15,22
**against (7)**
16:10;22:21,22,24;
23:7,16,19
**ago (2)**
15:4;25:23
**agree (3)**
15:16,19;51:4
**AGREED (3)**
4:3,8,15
**ahead (1)**
104:11
**alcoholic (2)**
6:14;7:10
**allegations (2)**
115:3,4
**alleged (3)**
17:19,21;115:4
**alleging (1)**
37:11
**allow (1)**
118:6
**allowing (1)**
107:25
**along (1)**
22:5
**always (6)**
29:11;43:19;44:14,
21;83:6;84:13
**ambiance (1)**
45:6
**amount (4)**
65:6,7;95:9,11
**amounts (3)**
63:25;95:6;99:21
**and/or (1)**
119:2
**android (2)**
97:2,3
**answered (4)**
10:20,22;46:10;
47:9

**anticipated (2)**
35:7,11
**app (6)**
97:4,8,12;98:9,10,
11
**appear (19)**
13:6,8,9,11;19:16,
19,21,22;21:6;33:10,
13,20;35:19;36:6;
55:12;58:23;64:24;
108:14,17
**appearing (1)**
6:13
**Apple (1)**
96:25
**application (5)**
90:20;91:2;96:17;
97:17,20
**apply (1)**
90:13
**appointed (1)**
91:6
**appreciate (1)**
52:13
**approached (1)**
76:19
**approximately (2)**
53:13;67:25
**April (29)**
32:2,5,7;33:3;35:7,
11;38:4,5;50:4,10;
51:3,11;52:23;53:23,
25;54:25;56:11,18,
22;57:2,5;60:9;62:5;
63:15,18;64:12;73:6,
25;89:21
**argue (2)**
117:24,24
**arguing (1)**
80:7
**argument (3)**
115:19;117:3,15
**arising (1)**
22:11
**around (18)**
7:9;26:13;27:13;
33:3;38:5;43:22,25,
25;50:4,10;51:3;62:3;
70:9;71:2,72:19;
73:22;79:5;89:8
**arrest (3)**
8:14;9:5,9
**arrested (3)**
8:11;9:12,22
**arrive (2)**
43:3;91:18
**assistance (1)**
113:24
**assisting (2)**
41:25;42:12
**Associates (2)**
113:16;119:2
**assume (1)**

113:19
**assuming (1)**
117:20
**Atlanta (5)**
51:19,20,22;85:4,
18
**attempting (1)**
117:11
**attention (10)**
22:18;26:3;69:17;
70:3,7,11,13,16;71:4;
72:7
**attorney (19)**
7:25;8:3,7;10:5;
11:7,18,20;13:23,25;
14:6,25;23:21,22;
45:23;108:7;116:3,7,
21;117:10
**attorney-client (4)**
22:12;24:8,17,19
**attorneys (2)**
4:4;113:16
**attorney's (2)**
14:14;32:24
**authorized (1)**
4:10
**Avenue (1)**
5:9

**B**

**back (8)**
17:19,19;38:15;
79:11,13,18;86:9;
118:13
**background (1)**
114:25
**bad (1)**
117:14
**basic (1)**
114:4
**basically (4)**
40:22;45:9;71:9;
81:16
**basis (14)**
24:4,16;61:16;
62:25;67:22,23;73:9,
12;103:23;105:14;
115:9;117:12,16,23
**bathroom (1)**
66:21
**beer (2)**
7:5,6
**begin (1)**
5:18
**beginning (4)**
64:12;73:25;110:8;
112:7
**Beside (2)**
41:20;97:20
**Besides (19)**
8:3;11:2;27:13;
41:20,24;42:10;

45:11,14,16;48:3;
68:13;73:2;88:8;
91:12,14;98:10;
101:4;102:21;113:3
**best (7)**
53:2;56:4;69:7;
70:5;82:21;88:11;
104:24
**Bestall (78)**
11:6,17;16:10,24;
17:2;25:2,2,2,3,19,25;
26:10,13,17,22;27:2,
5,9,18;28:9;29:24;
31:9;33:9;34:9,12,15;
35:18;36:4;37:25;
38:20;40:14,20,24;
41:5;42:24;46:22;
51:5;52:10;55:17,21;
61:12;63:12;65:15;
66:19;67:25;79:5;
88:3,12,22,25;89:4,5,
6;90:4,7,8,13;93:3;
98:24;99:6,9,15,18;
100:8,24;102:21;
109:4,21,24;110:2,14,
18,24;111:3,7,15;
112:5;113:3
**beverages (2)**
6:14;7:10
**beyond (2)**
42:15,20
**bigger (1)**
77:2
**bonus (1)**
95:10
**boss (2)**
77:2,3
**both (2)**
23:10;80:7
**bottom (2)**
35:23;38:14
**break (6)**
6:2,5;18:10;31:18;
79:16;113:6
**bring (7)**
69:16;70:2,13;
71:25;72:2;91:6;
118:13
**Bringing (1)**
42:21
**Bronx (1)**
5:9
**brought (5)**
70:6,10,15;71:3;
72:6
**business (26)**
43:4,14,15;44:4,6,
15;48:13,16,18,20,21,
22;49:17;80:6,17;
81:17;83:9,11,14;
85:23;92:15;94:13,
19;95:2,8;98:20
**busy (1)**

44:14
**buy (1)**
45:9
**buying (1)**
99:11

## C

**calculate (1)**
61:8
**calculating (2)**
110:24;111:8
**call (22)**
9:14,25;10:3;24:3;
29:23,25;30:2,14,15,
18;52:14;97:25;
103:19,20,21,22;
104:5,6;105:19,20,21,
24
**calling (1)**
113:22
**came (7)**
79:13,18;88:20,23;
90:3;98:12;112:15
**can (78)**
5:21,22;6:9;8:13;
9:2;10:19;11:7,14,18;
13:23;14:15,25;
15:17,21;16:14;
17:12;20:8,21;21:23;
22:17;24:10;25:9,15;
26:3;28:11;29:17;
31:20;32:2;35:15;
36:17,21;37:17;
40:19;41:9;42:16;
44:18;45:2;46:20;
47:16;49:4,7,19;
50:21;52:13;53:2;
55:23;59:7,8;61:7;
62:15;68:5,10;70:21;
74:16;78:23;79:8;
82:17;83:4;85:18;
93:2;94:5,10;95:3;
97:10;101:16;102:5,
7;104:9;106:4,8,12,
18;107:22;109:22;
115:18;116:12,13;
118:7
**cap (1)**
113:19
**captioned (2)**
11:6,17
**capture (3)**
103:11;104:8,15
**Carpal (1)**
5:9
**case (23)**
6:22;11:2;15:12;
16:9,11,13,14,16,23,
24;22:5;46:6;114:13,
17,18;115:12,13,14,
18;116:8;117:12,14;
118:21

**CEO (9)**
40:22;41:4,5,7;
77:3;86:23;92:22;
93:15,17
**certain (1)**
58:16
**certify (1)**
120:7
**cetera (14)**
21:22;22:5;41:13,
19;42:22;66:25;
70:25;71:12;74:19;
75:9;87:25;93:21;
95:23;98:22
**change (6)**
61:23,25;62:8;
104:18,19,25
**changed (4)**
62:6;94:8;104:16;
108:11
**chat (6)**
18:11;46:8;74:22,
23,24;96:15
**check (4)**
61:15;69:24,25;
93:9
**checks (8)**
68:16,18;69:13;
93:5,8,22,23;94:2
**Chelsea (1)**
38:20
**Christmas (1)**
72:22
**Christmastime (1)**
72:20
**circumstances (11)**
8:14;14:16,21;15:2,
22;26:20,24;27:12;
35:2;79:8;114:10
**claim (2)**
114:13;116:5
**claims (6)**
10:15,25;46:6;
101:6;114:16;115:14
**clarify (1)**
102:7
**clean (1)**
100:17
**clear (4)**
6:12;78:3;85:13;
96:5
**clearly (2)**
6:8;17:9
**CLERK (1)**
113:10
**client (28)**
8:17;9:7,9,24;
11:10;14:18;15:14,
24;18:11;20:18,24;
22:9;23:25;24:8;46:8;
52:12;101:25;102:11,
15;103:14,18,24;
105:14,16;107:13;

117:22;118:5,17
**clienteling (1)**
42:21
**clients (1)**
117:13
**close (3)**
48:15,22;49:17
**closed (5)**
48:18,20;59:22;
61:4,7
**closeout (3)**
98:23;99:2;100:14
**closing (4)**
48:13;49:19;59:24;
60:4
**clothes (1)**
99:11
**cocktail (3)**
6:19,20,21
**collecting (3)**
99:17,23;100:2
**comfortable (2)**
47:6,12
**coming (2)**
91:20;92:9
**committed (1)**
10:11
**communicate (4)**
73:25;74:6,20;97:4
**communicated (4)**
8:8;74:3;95:24;
97:16
**communication (1)**
118:4
**communications (1)**
118:2
**companies (1)**
42:2
**company (16)**
25:6,7,8,14;42:16;
45:9;54:9;79:9;83:5;
84:5;91:8,13;98:4;
99:21;111:17;119:3
**compensate (1)**
94:3
**compensated (1)**
61:11
**compensating (1)**
93:23
**compensation (26)**
30:8;31:3;34:14,25;
39:11,14,19,22;61:19;
62:13,17,19;63:2,5,
14,17;64:3;68:3,15,
20;69:12;77:14,20,
23;78:4,13
**Complaint (18)**
12:6,9,14,14;18:6;
20:7,8,11,13,14,15;
26:8;114:3,6,11,22,
23;115:5
**complete (1)**
120:10

**completely (1)**
9:11
**complies (1)**
26:7
**computer (2)**
93:20;100:20
**concern (1)**
53:4
**concerning (1)**
14:20
**conclude (1)**
118:7
**conduct (1)**
118:25
**conference (3)**
30:14;87:7;97:25
**confirmation (4)**
28:16;76:22;85:25;
86:8
**connection (2)**
90:20,25
**contain (10)**
34:7;36:18;37:2;
39:10,18;56:5;67:2,8,
12;109:8
**contained (3)**
40:4;58:12;65:10
**containing (1)**
65:23
**contains (2)**
15:10;67:15
**contemplated (1)**
115:11
**contemplates (1)**
115:20
**continue (5)**
10:10;20:22;24:4;
94:5;115:8
**control (1)**
25:17
**controlling (1)**
109:17
**conversation (12)**
29:6;71:13,18;
82:18,19;85:6,9,13;
86:10;94:11;95:4,6
**conversations (18)**
14:19;15:15,25;
20:20,25;22:11;24:7,
21;30:12;70:21,23;
71:16,21,22;72:15;
73:2;74:17;87:14
**convicted (2)**
8:20;9:15
**convictions (3)**
8:20;9:10;102:19
**Coors (1)**
7:5
**copy (3)**
12:12;38:8;118:18
**corner (2)**
19:20;33:17
**corrections (1)**

118:19
**correctly (1)**
66:3
**counsel (2)**
102:10;118:10
**counting (2)**
45:7;49:21
**COUNTY (1)**
120:5
**couple (2)**
73:16;109:7
**course (16)**
7:15;21:3;52:20;
69:10;73:13;83:14;
85:8,22;86:4;90:14;
92:25;97:22;99:13;
111:4,16;118:24
**COURT (41)**
5:6;6:9;9:2,3,14,25;
10:3;11:5,16;12:6,9,
15;17:25;18:6;20:3;
22:7;23:4;24:4,13;
105:17;113:12,18;
114:2,6,8,11,12,20,
22;115:2,6,15,16;
116:3,4,9,19;20:5;
117:11,17;118:10
**courtesy (1)**
52:14
**coworkers (5)**
88:3,6,8,9;97:8
**crime (2)**
9:16;10:12
**criminal (8)**
8:24;9:18;101:8,12,
17,21,23;102:12
**cross (1)**
118:16
**currently (2)**
7:16;101:5
**customer (1)**
91:20
**customers (7)**
41:22,25;42:11,21;
45:8;78:22;92:10
**Cutting (1)**
49:21

## D

**daily (3)**
67:22,23;75:5
**date (9)**
27:11,13;35:7,11;
43:19;50:8;51:4,7;
62:6
**dated (3)**
32:2,7;81:24
**dates (7)**
27:17;38:7;59:19,
20;93:7;110:5;111:9
**David (1)**
12:11

**day (15)**
41:10,14;44:14,20,
22,24;49:23;74:9,19;
84:9;91:16;96:9;
97:19;98:20;120:21
**days (7)**
44:8,10;48:18,21,
23;52:3;85:19
**day-to-day (4)**
73:9,12;80:19;
87:17
**December (3)**
72:22,23;73:21
**defend (1)**
117:14
**defendant (6)**
5:16;10:5;101:21;
102:4;113:17;118:20
**Defendants (2)**
12:4;18:3
**Defendant's (13)**
12:8;18:5;31:13,14;
54:20,21;64:7,8;66:7,
8;81:19,20;114:4
**defending (1)**
80:8
**defense (9)**
114:13;115:9;
116:5,8;117:3,5,7,19,
20
**defenses (2)**
46:6;114:16
**dependable (1)**
83:25
**depending (1)**
69:25
**deposit (4)**
65:17,20,23;93:5
**deposited (1)**
65:16
**deposition (16)**
4:6,9,13;5:17,18;
7:24;8:5;11:20,21;
14:2;24:25;46:4;
108:6;118:8,25;120:9
**depositions (1)**
119:2
**deposits (1)**
64:22
**describe (18)**
8:13;14:15,25;
16:14,16,22;21:23,25;
25:9;40:19;45:2;49:4,
7,19;70:21;79:8;95:3;
109:22
**detailed (1)**
50:22
**details (1)**
14:24
**device (1)**
96:18
**different (8)**
19:8;24:20;37:14,

19;39:14,22;40:12;
107:19
**dinner (1)**
73:23
**direct (11)**
22:9,17;26:3;65:17,
20,23;87:14;93:4;
102:17;108:3;114:8
**directed (2)**
100:7,13
**directing (9)**
9:24;14:18;15:24;
20:18;23:25;101:20;
102:14;103:14;108:2
**directly (13)**
15:12;45:23;74:6;
77:23;78:4,8,18;87:8,
9,10;92:17;98:8;
116:8
**disclose (2)**
14:19;15:24
**discovery (1)**
118:23
**discuss (7)**
28:14,23,24;29:9,
16,18;40:5
**discussed (4)**
28:21;29:2;96:2,5
**discussing (4)**
28:8;30:21;31:2,6
**discussion (3)**
10:7;18:25;68:11
**discussions (3)**
14:24;30:20;31:2
**dishonesty (1)**
8:22
**disrespect (1)**
106:2
**District (2)**
20:4;23:4
**divulge (1)**
15:14
**docket (1)**
114:22
**document (97)**
12:13,21;13:3,4,7,
12,13,14,18,19;14:10,
17,20;15:3,8;18:16,
17,20;19:4,5,8,11,14,
17;21:7,10,11,15,16,
19,24;31:25;32:4,7,
12,15,18,20,21,23;
33:11,14,17,21,22,23;
34:2,5,6,7,13,19,20;
35:17,20,23;36:7,12,
24;37:2,7,8,11,13;
38:3,14;39:16,18;
40:5,12,17;55:13,15,
25;56:5,10,17;57:11;
59:10,13;60:13,15;
64:25;81:25;82:2,5,7;
103:7,15,16,25;
104:10,14;108:15,19;

109:2,5
**documentation (1)**
90:19
**documents (7)**
55:3,7,8;64:14,17,
19;90:23
**dollars (12)**
28:25;61:21;62:7,
10,22,23;68:24;
74:19;94:15,16,18;
95:13
**done (3)**
32:10;37:22;100:8
**door (2)**
45:5;49:24
**drawer (1)**
45:7
**dreams (1)**
116:11
**due (2)**
43:19;99:21
**duly (1)**
5:2
**duplicity (1)**
117:23
**during (12)**
30:11,25;52:9,18;
67:24;72:14,25;73:4;
78:15,18;85:3;89:25
**dust (1)**
71:9
**duties (3)**
40:19;42:2,13

## E

**earlier (3)**
50:14,19;51:2
**early (1)**
84:15
**easiest (1)**
5:22
**effect (1)**
4:11
**Eight (7)**
43:13,19,22,25;
49:18;60:24;61:7
**either (8)**
28:13;43:25;48:25;
71:14;87:6,12;90:22;
100:24
**elicit (1)**
117:6
**else (25)**
8:8;33:20;41:15;
42:5,7,8;45:10,13,15,
16,19;46:19,21,24;
47:22;48:3;68:25;
75:7;88:12;91:25;
92:4,11,14;94:24;
108:13
**else's (2)**
35:19;104:5

**e-mail (1)**
29:23
**emergency (1)**
86:22
**employed (3)**
36:13,25;55:16
**employee (3)**
67:16;75:19;76:2
**employees (7)**
48:24;75:8,8,10,12;
76:20;91:13
**employer (5)**
22:25;23:8,10,16,
20
**employment (26)**
28:8,10;31:9;33:9;
34:8,11;52:9,19;67:6,
25;69:11;74:8;78:15,
18;85:3;99:6,9;103:2;
108:20,22,25;109:6;
112:14,21;113:3,3
**encountered (1)**
113:22
**end (4)**
74:11;96:9;112:15,
16
**entire (2)**
74:7;76:12
**entitled (2)**
17:23;62:13
**establish (4)**
114:16,17,19;
115:11
**et (14)**
21:22;22:5;41:12,
18;42:22;66:24;
70:25;71:12;74:19;
75:9;87:25;93:21;
95:23;98:22
**Europe (6)**
73:8,13;80:14,15;
83:6;98:2
**even (3)**
37:21;84:14;117:20
**events (3)**
26:25;27:3,4
**Everyone (1)**
113:10
**Everywhere (1)**
109:13
**evidence (3)**
12:5;18:4;103:7
**exact (3)**
89:19;95:9,11
**exactly (1)**
86:6
**EXAMINATION (2)**
5:11;118:17
**examined (1)**
5:4
**except (1)**
4:16
**excess (8)**

52:8,17;53:7,12,17;
54:11;58:24;59:21
**Excuse (10)**
17:6;46:16;53:15;
61:5;77:6;90:21;92:2;
110:9;111:19;116:12
**executed (2)**
38:22;39:2
**Exhibit (21)**
12:5,6,8;18:4,5;
19:9;22:18;26:4;
31:13,14,25;54:20,21;
64:7,8;66:7,8;81:19,
20;107:20;108:9
**exist (3)**
37:11;97:17;117:21
**exited (2)**
10:5;35:18
**expect (1)**
5:21
**expenses (1)**
117:22
**experience (1)**
68:2
**experienced (1)**
69:11
**experiencing (2)**
68:18;71:5
**explaining (1)**
7:3
**exploring (1)**
115:10
**extended (3)**
51:15;52:4;84:18

## F

**facebook (4)**
41:12,18;42:2,12
**Face-to-face (1)**
86:12
**facilitate (1)**
5:22
**fact (4)**
80:5;117:10,21;
118:23
**factual (1)**
115:24
**fairly (1)**
17:10
**faith (1)**
117:15
**familiar (11)**
11:4,15;19:3,6,10;
25:3,10;28:4;55:8;
83:16;104:13
**familiarize (14)**
18:16,20;21:10;
32:3;55:3;64:14;
66:14;81:25;104:10;
105:12;106:6,9,20,24
**familiarizing (1)**
32:8

**fashion (1)**
  109:10
**February (5)**
  103:12;104:8,17;
  105:4;120:9
**Federal (7)**
  20:3;23:3;101:4;
  105:17;108:5;114:4;
  115:4
**feel (9)**
  6:3;45:21;47:5,12;
  79:21,22,23,24;80:2
**fees (1)**
  117:13
**felony (1)**
  8:21
**file (12)**
  22:6,13,19,24;23:3,
  7,15,19,22;116:3,7;
  117:10
**filed (9)**
  11:5,15,25;12:15;
  16:3;17:24;20:7,16;
  115:2
**filing (9)**
  4:5;15:22;16:2;
  17:15;114:2,3,5,10,11
**find (1)**
  80:5
**fine (4)**
  9:11;14:22;46:11;
  102:19
**finished (3)**
  12:18;32:8;64:16
**fired (1)**
  102:20
**first (31)**
  5:2,18;25:18,24;
  26:9,16,21;27:2,8,10,
  14;28:8;30:16,16;
  32:19,20,25;39:24;
  40:14;47:24;61:18;
  70:2,6,10;71:3;73:20;
  77:11;88:16;89:16;
  105:21,25
**five (4)**
  26:6;48:17,18,21
**flawed (1)**
  39:16
**flew (2)**
  72:16;87:23
**floor (1)**
  83:19;100:18
**following (2)**
  34:22;103:7
**follows (1)**
  5:4
**force (1)**
  4:11
**forget (1)**
  104:6
**form (7)**
  4:16,17;35:13;

  36:17,21;38:24;59:5
**former (4)**
  22:25;23:8,16,19
**four (13)**
  62:2;70:8;94:12,18,
  25;95:2,7,15,16,18,
  19,22,23
**fourth (1)**
  79:11
**frame (1)**
  43:13
**free (2)**
  6:3;21:4
**Friday (1)**
  44:9
**front (2)**
  31:24;39:15
**full (7)**
  27:23;47:20;69:14;
  76:4,12;93:12,24
**full-blown (1)**
  71:13
**fundamental (1)**
  114:15
**FURTHER (3)**
  4:8,15;118:14
**future (1)**
  118:25

**G**

**gained (1)**
  20:19
**gave (7)**
  37:9,13,15;38:15;
  90:10;93:5,23
**Generally (3)**
  27:4;67:15;115:10
**Gerald (9)**
  47:23;48:3;49:2,7;
  75:15;76:3,4;88:15,
  16
**Gerald's (1)**
  47:24
**Girl (1)**
  109:10
**given (3)**
  39:23;40:13;120:12
**giving (1)**
  118:5
**goal (2)**
  17:14,16
**goes (1)**
  34:24
**Good (7)**
  5:13,14;43:4;83:18;
  92:7;113:12,14
**great (3)**
  43:15;74:18;113:4
**gross (1)**
  65:7
**ground (1)**
  5:19

**group (8)**
  74:22,23,24;75:4,7;
  96:14,15;97:5
**guess (3)**
  34:21;77:2;106:18
**guiding (1)**
  102:10
**guy (2)**
  87:17;100:18

**H**

**half (4)**
  67:11;68:23;69:3;
  70:25
**handed (3)**
  18:8,15;81:5
**handing (5)**
  12:12,13,16;54:24;
  55:4
**handle (5)**
  78:24;80:22;91:21;
  92:15,23
**handled (2)**
  80:21;99:10
**happen (1)**
  17:17
**happened (3)**
  71:24;86:20,21
**happening (1)**
  69:23
**happy (1)**
  5:25
**head (5)**
  6:11,11;27:17;
  98:18;100:21
**hear (1)**
  6:9
**heard (2)**
  79:11;102:18
**hearing (1)**
  116:24
**held (2)**
  10:7;18:25
**help (2)**
  46:12;82:20
**helpful (2)**
  18:14;117:7
**helping (3)**
  41:24;42:9,10
**HEREBY (2)**
  4:3;120:7
**herein (2)**
  4:5;5:1
**hey (1)**
  83:3
**hi (1)**
  98:18
**higher (1)**
  77:3
**highlighted (3)**
  58:17,20,23
**hire (1)**

  46:15
**hired (14)**
  27:9,10;28:13;29:7,
  22,24;30:16,17;75:21,
  22,23;76:15,17;77:11
**history (4)**
  8:24;108:20,23,25
**hit (2)**
  95:22,22
**hold (7)**
  8:15;10:18;20:17;
  35:12;101:10;113:11,
  11
**holders (1)**
  45:12
**holiday (1)**
  72:19
**holidays (1)**
  73:22
**home (1)**
  91:18
**honestly (1)**
  7:14
**Honor (6)**
  113:15,21;115:23;
  116:15,18,24
**hoping (1)**
  116:10
**hour (7)**
  53:19;61:21;62:10;
  68:24;94:15,16,18
**hourly (8)**
  29:3;34:25;39:19,
  22;61:16,19;94:15,23
**hours (51)**
  6:15;7:11,21;29:11,
  20;40:15;42:25;52:9,
  18;53:7,12,13,17,17,
  22;54:3,8,11,14;
  55:10,16;56:2,12,19,
  21,25;57:4,8,12,15,
  18,21,25;58:4,6,9,16,
  22,24;59:18,21;
  60:14;63:11;65:6;
  66:4;68:24;84:13;
  93:13,21,21,24
**hypothetical (1)**
  87:13
**hypothetically (2)**
  86:13,17

**I**

**idea (1)**
  90:24
**identical (4)**
  23:13,15,19;115:3
**identification (10)**
  12:10;18:7;31:16;
  54:23;64:7,10;66:7,
  10;81:19,22
**identified (1)**
  33:16

**identities (1)**
  46:18
**illicit (1)**
  117:9
**Illiya (50)**
  28:17;30:11,13,15,
  24;36:6;38:21,25;
  49:23;70:14,19;72:4,
  8,9,10,14,25;73:4,7,
  11,14,25;75:22,24;
  76:16,17,21,22;80:9,
  10,22;81:10,13,16;
  83:6;84:21,23;85:10;
  86:2,8,25;87:4,5,23;
  90:11;92:21,22;96:2;
  97:10,16
**Illiya's (5)**
  27:22;30:2;36:5;
  76:24;83:2
**Illyia (1)**
  87:3
**impair (2)**
  6:25;7:13
**impeachment (1)**
  8:25
**improperly (1)**
  102:10
**inaccuracies (4)**
  36:19;37:3,10;56:6
**inaccurate (1)**
  65:11
**incident (1)**
  71:24
**includes (2)**
  20:19;34:22
**including (2)**
  55:2;64:13
**income (2)**
  42:9;65:7
**incur (1)**
  117:13
**incurring (1)**
  117:22
**independent (1)**
  21:4
**independently (1)**
  100:11
**individual (3)**
  30:6;76:15;77:7
**individuals (6)**
  76:11,18;90:22;
  91:12,17;92:6
**inform (1)**
  39:17
**information (53)**
  15:14;20:19;22:10;
  34:8,11,14,18;39:10,
  13,18,21,23;40:4,11,
  13,16;41:23;45:21;
  46:3,5;56:12;57:13;
  58:7,11,12;59:15;
  60:2;65:4,10,23;66:2;
  67:2,8,12,16;74:21;

90:23;91:25;92:3,5,
11,14;95:24;96:6;
104:14,16,25;107:7,
17;109:6,8;114:5;
118:24
informed (5)
79:13,19;80:6;81:9,
13
initially (1)
61:11
instagram (1)
41:18
instances (6)
52:21;53:6;58:19;
59:4,11;74:5
instruct (4)
9:6;23:22;116:21;
117:10
instructed (3)
116:2,7;117:25
instructing (5)
8:16;9:8;15:13;
103:24;105:14
instructs (2)
14:7;108:7
intended (1)
94:2
interested (5)
6:24;15:7;50:12,13;
116:23
interview (2)
90:15,17
interviewed (2)
27:19,21
into (5)
12:5;14:23;18:4;
72:16;103:6
invoices (5)
99:18,19,20,23;
100:2
involved (10)
9:18;10:14,25;
101:5,8,11,14,15,23;
102:12
issue (2)
86:18;113:23
issues (15)
68:2,7,14,19,22;
69:11,16;71:5;78:21;
84:10,12;86:14;
87:12;91:19;92:10

**J**

January (2)
72:21,23
Jason (2)
5:15;113:15
Jay (11)
47:19,19;48:3,25;
49:4;75:15,21,22,23;
88:15;89:3
Jay's (2)

47:20;75:16
job (3)
74:18;102:20;
109:19
jobs (2)
26:18;27:15
judge (5)
102:18;103:19;
105:21;113:11,13
judgment (1)
115:17
judicata (2)
115:9,18
July (1)
62:3
June (2)
62:3;112:9

**K**

keep (1)
52:23
kept (1)
58:3
key (1)
45:12
kids (1)
98:21
kind (5)
25:7;92:24;96:20,
21,23
knew (7)
82:19;83:8,10,13,
18;100:21;111:10
knowing (4)
6:24;15:7;50:12;
80:16
knowledge (2)
21:4;56:5
known (1)
100:25
knows (1)
83:5

**L**

laid (1)
80:2
last (17)
6:14;7:9,11,21;
8:21;9:11;11:10;
14:16;24:11;28:2;
30:5;31:21;47:24;
75:16;85:16;105:19;
113:19
late (3)
84:15;91:20;92:9
lawsuit (24)
8:9;11:25;15:22;
16:2,3,6;17:5,8,15,24;
19:25;20:7,16;22:6,
13,19,24;23:3,7,23;
62:14,17;114:4;116:7

lawsuits (4)
23:11,13,16,19
lawyer (5)
13:5,17,18;117:25;
118:4
laying (1)
5:19
leading (3)
15:22;26:25;79:9
learn (1)
29:21
learned (1)
100:23
leave (8)
35:3;43:11,18,20,
22;71:15;84:15,15
leaving (1)
43:14
led (1)
27:4
left (5)
19:20;33:17;
110:24;112:22;
115:25
legal (8)
10:15;11:2;115:15,
19,19,24;117:13;
118:6
less (4)
54:7;62:23;111:25;
112:2
letter (25)
31:9,15;32:2;35:10;
36:9,14,18;37:24;
38:9,11,17,22;39:2,9,
15;77:5,8;81:21,23;
82:4,9,15,22;83:4,24
Letting (1)
5:21
Levin-Epstein (1)
113:16
lights (2)
45:5;49:21
limit (1)
102:2
line (5)
113:23,25;114:9;
115:8,23
LinkedIn (9)
103:11;104:8,18,
19;105:2,8;106:3;
110:21;111:5
list (7)
65:5,6;66:3;108:19,
22;109:2,5
listed (2)
35:22;58:7
lists (1)
35:6
litigate (1)
117:12
litigation (1)
101:4

little (2)
50:21;102:8
LLC (3)
11:6,17;25:2
Locking (1)
49:23
long (5)
52:2;76:9;111:18,
20,22
look (12)
103:14,16,17,24;
105:10,18;106:4,12,
17;107:5,21,22
looked (1)
38:13
looking (2)
108:9;114:21
looks (15)
19:7;21:21;34:10,
16;35:5;37:4;39:20;
49:4,8;55:10,18;
64:22;65:5,18,25
lot (1)
27:16
loud (1)
6:12
loudly (1)
6:7
lower (1)
33:22

**M**

maintaining (1)
24:16
makers (1)
25:8
making (7)
25:14;45:5,7;84:5;
112:18,19,19
manager (6)
25:11,16;40:25;
41:3,10;109:3,9,11,
14,16
Managing (2)
42:6,11
manner (1)
97:21
manually (3)
93:14,17,20
many (25)
7:10;48:15;52:21;
53:6,13,17,22;54:3;
56:21,25;57:8,15,18,
21;58:9,19;73:14,17,
24;74:5,9;88:6;97:15;
98:14;105:16
mark (6)
12:6;18:4;31:12;
64:6;66:6;81:18
marked (8)
12:9;18:6;31:15,25;
54:22;64:9;66:10;

81:22
marking (1)
54:20
matter (4)
5:16;15:18;47:11;
113:17
may (35)
4:9;6:25;14:19;
26:11,13;39:7;51:8,
11;54:4;55:2;57:12,
16,19,22;60:9;61:20;
63:21,23,25;64:13;
67:8;73:6;74:2;79:5;
81:24;89:23;102:23,
24,25;103:3,4;110:6,
19;112:2,7
Maybe (10)
51:23,23;62:2,3;
68:25;70:9;71:2;
72:19;84:15;102:7
mean (33)
13:2,5,13;17:10,10;
18:13;22:3;25:22;
34:10;35:4;40:7,21;
41:17;42:18;50:16;
61:13;63:9;71:19;
73:5;79:25;80:13,17;
83:23;84:7;85:11,19;
87:4,8;90:5;93:19;
99:19;115:16;118:3
means (1)
6:9
medications (2)
7:17,19
meet (5)
73:14;88:16;89:3,
16;98:14
members (1)
48:7
memory (1)
69:7
mentioned (1)
88:2
merchandising (2)
100:5,7
Meric (27)
30:11,20,24,25;
31:5;38:21,25;73:7,
11,15,25;74:6,10,21;
77:19,21,23;78:3,7,
12,17;79:4,10;97:21;
98:3,7,14
Meric's (1)
36:6
message (6)
72:12;84:20,23;
85:11,11;96:3
messaging (1)
74:3
met (4)
73:20;88:24;89:12,
15
Michael (13)

5:8,13;6:13;7:23;
8:11;9:12,15;10:11;
11:8;52:8;105:7;
120:7,17
**might (1)**
  8:18
**mind (3)**
  11:12;18:10;46:7
**mine (1)**
  24:20
**MINIMUM (2)**
  66:9,12
**minor (1)**
  92:20
**minute (3)**
  18:16,23;107:15
**misdemeanor (1)**
  8:22
**MISRAHI (1)**
  31:12
**mister (1)**
  52:15
**MIZRAHI (54)**
  5:12,15;8:16,23;
9:6;10:2,9;12:4,11;
14:22;18:3,12,24;
20:21;24:3,10,15,23;
31:17,20;46:9;52:15,
16;54:19;64:6;66:6;
81:18;101:19;102:9;
103:6,21,23;105:13,
23;107:14,16;113:5,8,
14,15,21;114:14,25;
115:7,22;116:6,14,18,
23;117:8;118:9,11,14,
20
**Moda (27)**
  11:6,17;25:2,2,3,19,
25;26:10,13,17,22;
27:2,5,9,19;28:9;
31:10;37:25;38:20;
40:14,20,24;41:6;
46:22;51:6;55:17;
88:12
**moment (15)**
  12:16;18:19;21:9;
26:4;32:3;55:2,23;
64:13;66:13;81:25;
104:9;105:11;106:5,
8,24
**Monday (4)**
  35:7,11;44:9,16
**money (8)**
  49:22;63:8,9;69:3;
95:6;112:18,19,19
**Moneywise (1)**
  42:18
**month (5)**
  65:21,22;69:23;
93:13;95:10
**monthly (2)**
  69:23,25
**months (8)**

62:2;70:8;93:5,8;
94:17;111:24,25;
112:3
**more (17)**
  11:11;41:4;50:21;
52:12;54:6;59:18;
60:11,20,21,22,25;
61:8;62:22;69:6;
83:16;95:14;111:24
**morning (2)**
  5:13,14
**Most (3)**
  52:22;53:8;100:20
**mostly (3)**
  46:23;49:24;90:11
**moved (2)**
  76:8;79:25
**much (10)**
  15:9;37:17;60:8,22;
62:19;63:14,17;66:3,
24;96:9
**mute (1)**
  115:14
**myself (3)**
  46:20,23;78:23

## N

**name (44)**
  5:7,15;11:10;13:6,
8,11,14,16,17;19:16,
21,22;21:6;27:23;
28:3;30:5;33:10,12,
17,20;35:19,22;36:6;
47:6,20,25;52:13;
55:12;64:24;74:23;
75:16,18,25;76:4,13;
85:16;97:4;103:9;
104:6;105:19,21,25;
108:10,14
**names (2)**
  47:17;75:14
**neat (1)**
  37:22
**necessary (1)**
  118:25
**need (10)**
  9:2;18:22;77:25;
95:7;106:21,25;
107:5,23;108:3;
114:15
**needed (2)**
  84:8;100:9
**networking (5)**
  42:9,12,22;50:2;
59:23
**New (15)**
  5:3,9;11:5,16;12:2;
16:4;20:4;22:14,19;
23:4,23;67:6,17;
118:23;120:3
**next (2)**
  87:21,24

**nickname (1)**
  47:19
**night (3)**
  7:9;74:11,12
**nine (5)**
  43:16;60:25;
111:24,25;112:2
**Nobody (1)**
  100:9
**nod (1)**
  6:11
**none (1)**
  84:16
**nonverbal (1)**
  6:10
**normal (2)**
  41:9,14
**Notary (2)**
  5:2;120:25
**noted (1)**
  119:4
**notes (1)**
  113:18
**number (4)**
  53:9,11;61:2;98:2
**numbers (3)**
  49:23;58:20,23

## O

**oath (4)**
  4:11;48:10;108:5;
120:9
**object (5)**
  20:21;36:16,20;
38:23;59:5
**objecting (2)**
  20:23;35:13
**objection (2)**
  24:5,16
**objections (1)**
  4:16
**obviously (14)**
  43:16;51:8;72:4;
80:8,25;82:25;86:23;
87:10;89:11;93:4,6;
97:18,24;100:3
**occasions (2)**
  48:15;98:17
**o'clock (9)**
  43:5,6,7,8,9,19,22;
44:7;49:18
**October (2)**
  70:9;71:2
**off (9)**
  10:7;18:25;49:21;
50:2;52:5;71:9;80:2;
85:19,21
**offer (18)**
  31:8,14;32:2;34:21;
35:10;36:9,14,18;
37:24;38:8,11,17,22;
39:2,9,15;77:5,8

**office (3)**
  14:14;32:24;85:2
**officer (2)**
  4:10,12
**official (1)**
  40:23
**often (3)**
  65:14,16,19
**old (1)**
  49:12
**older (1)**
  100:18
**Once (2)**
  65:21,22
**one (22)**
  7:12;31:11;35:23;
37:14;44:21,23;
48:24;69:24;73:2;
80:25;81:4,7;83:8,13;
98:2;100:19;109:17;
111:17;115:13,23;
117:2,18
**one-year (1)**
  67:25
**only (12)**
  6:3;48:7,25;59:3,
11;60:14;68:24;
74:11;98:2;111:16;
114:23;116:23
**onto (1)**
  94:19
**open (9)**
  41:14;43:16;44:5,6,
8,10,15,19;48:22
**opened (5)**
  44:23;45:16;48:20;
61:3,6
**Opening (9)**
  41:11,20,24;42:10;
45:2,4,11,13;60:3
**operations (12)**
  25:11,16;40:21,21,
25;41:2,10;109:3,9,
11,14,15
**operative (1)**
  114:23
**order (1)**
  117:13
**Ordioni (6)**
  28:3;30:4;35:24;
76:23;82:9;85:15
**out (13)**
  37:7;42:9;45:21;
58:3;69:22;71:8,11;
80:5,12;81:5;82:21;
85:22;116:16
**outside (1)**
  46:8
**over (11)**
  53:18;54:14;68:23;
69:10;72:9;73:18,20;
76:6;87:6;98:16;
118:24

**overhear (1)**
  80:7
**overtime (13)**
  21:21;22:4;53:13;
59:3,11;60:8,14;67:3,
9,13;69:14;71:6;
93:25
**owe (1)**
  69:4
**owed (9)**
  62:16,20;63:2,4,9,
15,18;64:2;99:21
**own (2)**
  16:23;116:22
**owning (1)**
  94:25

## P

**paid (23)**
  17:19,19;21:21;
29:3,7;61:14,16;
63:11;66:3;68:12,13,
17,18,24;69:12,13,21;
70:24;71:5,6;93:3,8,
18
**paper (15)**
  19:8;40:8;50:5,7,
11,13;51:4;73:2,6;
58:8;60:11;61:9;
75:13;89:14;93:4
**paperwork (1)**
  76:20
**paragraph (1)**
  26:5
**part (4)**
  30:20;33:22;99:6,9
**parties (1)**
  4:5
**partner (5)**
  27:22;30:3;36:5;
76:24;83:2
**party (1)**
  101:13
**past (1)**
  99:21
**pay (18)**
  17:22;22:4;61:23;
62:5;63:6,7;64:22;
65:3,3,5,11,13,14;
68:6,16;69:3;93:3;
94:8
**payment (5)**
  28:14,21,24;30:22;
93:25
**payments (1)**
  93:10
**pending (1)**
  19:25
**per (15)**
  29:20;52:9,18;53:7,
20;54:11,14;55:11;
56:12;58:24;59:21;

61:21;62:10;74:9;
95:10
**percent (11)**
94:12,19,25;95:2,8,
15,16,18,19,23,23
**perfectly (1)**
21:4
**perform (1)**
49:25
**performing (2)**
25:18;26:10
**period (4)**
51:15;93:3;111:21;
112:11
**periods (1)**
52:5
**permission (1)**
85:20
**person (10)**
72:3,5,7;77:4,10,13,
16;83:19;98:12,15
**personal (4)**
46:3;106:14;107:6,
24
**persons (1)**
47:17
**pertaining (3)**
26:23;34:11,14
**pertains (2)**
114:9;118:23
**Perusing (5)**
12:17;18:18;21:20;
55:5;64:15
**phone (27)**
9:2,3;29:23,25;
30:2,13,14,18;72:5,8,
9,10;79:11;87:7;
96:20,21,22,23;97:12,
14,24;106:13,15,18;
107:6,24;113:9
**phones (1)**
96:19
**photograph (2)**
66:12,14
**picture (1)**
106:18
**place (4)**
38:19;71:17,18,23
**plaintiff (7)**
19:25;114:6,8,18;
115:20;116:2,12
**plaintiff's (2)**
102:10;115:11
**play (1)**
98:21
**Please (39)**
5:6;6:10;8:13;9:6;
10:21;11:8,13,19;
12:6;14:15,25;15:17;
16:14,19;17:12;
18:16;21:23;22:17;
23:24;24:10;25:9;
26:4;28:11,18;31:12;

32:3;36:23;40:19;
49:4,7,19;55:2;59:9;
64:13;66:13;103:16;
104:9;105:25;106:8
**plugged (3)**
93:15,17,19
**plus (4)**
42:25;54:8,12;
95:22
**pm (4)**
7:9;43:13;44:2;
119:4
**point (3)**
37:7;52:18;67:24
**pop (1)**
98:18
**portion (1)**
24:12
**posed (2)**
24:11;29:13
**possibility (1)**
114:19
**possible (1)**
5:23
**Possibly (2)**
51:25;74:7
**posted (1)**
66:13,20
**POSTER (8)**
66:9,12,16,17,22;
67:5,22,23
**preceded (1)**
114:3
**prepare (2)**
7:23;8:4
**prepped (1)**
45:8
**prepping (1)**
41:12
**prescription (1)**
7:17
**present (8)**
30:11,25;31:5;
38:21;39:2,5;72:14,
25
**presentable (1)**
45:6
**presented (10)**
6:4;11:23;38:11;
40:11,17;77:4,8;
104:14;107:18,19
**presenting (1)**
47:6
**preserve (1)**
117:16
**presume (1)**
116:11
**presuming (1)**
116:20
**previously (4)**
50:3;79:4;88:2;
96:8
**printed (1)**

58:8
**prior (1)**
8:24
**privilege (4)**
22:12;24:9,17,20
**privileged (2)**
21:3;118:4
**probably (7)**
19:6;46:25;59:18;
70:12;98:16;111:21;
114:21
**problem (2)**
104:5;107:16
**procedures (6)**
45:3,4;49:20;98:23;
99:3;100:14
**proceed (1)**
118:7
**proceeding (4)**
101:22;102:4,17;
105:18
**proceedings (9)**
9:19;10:15;11:2;
101:6,9,12,17,24;
102:13
**profile (21)**
103:11;104:8,18,
19;105:2,8,12;106:3,
6,7,9,20,22;107:2,7,
18,20;108:10,11;
110:22;111:5
**provide (1)**
20:18
**provided (2)**
37:24;38:3
**providing (1)**
50:24
**Public (2)**
5:3;120:25
**Pugh (178)**
5:8;6:1;7:1;8:1;9:1;
10:1;11:1,6,17,19;
12:1,20;13:1,24;14:1,
23;15:1,21;16:1,3;
17:1;18:1,8,15,19;
19:1,3,10,13,16,24;
20:1;21:1,6,9;22:1,6,
13;23:1;24:1,24;25:1;
26:1;27:1;28:1;29:1;
30:1;31:1,8,24;32:1,
11,14,17;33:1,10,23;
34:1;35:1;36:1;37:1,
2,10;38:1;39:1;40:1;
41:1;42:1;43:1;44:1,
4,19;45:1,22;46:1;
47:1;48:1,10;49:1;
50:1;51:1;52:1,13,17;
53:1,6,22;54:1,24;
55:1,6;56:1;57:1,18;
58:1,11,15,22;59:1;
60:1;61:1,10;62:1,12;
63:1;64:1,11;65:1;
66:1,11;67:1;68:1;

69:1;70:1;71:1;72:1;
73:1;74:1;75:1;76:1,
23;77:1;78:1;79:1;
80:1;81:1,23;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1,20;
104:1,4,7;105:1,20,
24;106:1,2,19;107:1,
17;108:1,4,14;109:1;
110:1;111:1;112:1;
113:1;114:1;115:1;
116:1;117:1;118:1;
119:1,2;120:7,17
**pulled (1)**
107:9
**punch (2)**
58:2,3
**punch-in (3)**
56:23;57:23;59:2
**punch-out (2)**
56:24;59:3
**Purdy (1)**
109:10
**purpose (1)**
118:5
**purposes (1)**
8:25
**put (3)**
58:9;111:9;113:11

## Q

**quick (2)**
31:18;113:6

## R

**raise (4)**
68:7;94:8;115:18;
117:15
**raised (1)**
94:17
**raising (1)**
94:20
**ran (1)**
77:21
**range (1)**
95:12
**rate (6)**
61:23;62:5;65:5;
94:8,15,23
**read (4)**
21:11;24:13;31:23;
120:8
**reading (1)**
26:5
**ready (1)**
10:9
**real (1)**

87:13
**really (7)**
21:16;39:17;71:13;
80:15,20,22;100:18
**reason (1)**
6:23
**reasonable (2)**
97:7,11
**recall (23)**
26:20,25;38:25;
39:4,6;50:9,19;51:2;
53:9,11;54:3;57:10,
17,20;70:6;73:3,18;
74:25;90:6;102:22;
103:5;111:13,23
**receipts (1)**
49:22
**receive (8)**
17:14;31:8,11;
65:14,19,22;95:7,14
**received (3)**
39:10;65:8,13
**receiving (2)**
69:14;118:5
**recess (2)**
31:19;113:7
**recognize (6)**
12:20;32:11;55:6;
64:19;66:16,17
**recollection (5)**
22:17;26:5;48:6;
88:11;104:24
**RECOMMENDATION (8)**
81:21,24;82:4,10,
15,22;83:4,24
**record (16)**
5:7;10:4,8;19:2;
24:13;32:7;78:3;
85:12;96:5;97:15;
102:9;107:13;113:9;
118:21;120:11,12
**records (1)**
59:3
**recover (6)**
17:4,7,13;114:18;
115:13,13
**recovery (2)**
17:18;115:12
**refer (1)**
52:11
**referring (3)**
24:25;52:15;75:11;
84:4
**reflect (1)**
10:4
**refresh (2)**
22:16;26:5
**refusing (1)**
114:7
**regarding (8)**
14:24;15:25;30:7;
34:8;35:2;39:13;
77:19;114:5

Case 1:18-cv-03556-DLC   Document 103   Filed 06/04/19   Page 131 of 133
MICHAEL PUGH vs.
MERIC

MICHAEL PUGH
February 28, 2019

**regards (18)**
29:19;30:8;31:9;
36:3;39:10,19,21;
40:5;67:9,16;68:14,
17,19;77:14,17;
78:18;109:6;113:23
**register (1)**
45:7
**reissue (1)**
118:22
**relates (1)**
8:22
**relation (1)**
76:25
**relative (1)**
115:21
**relay (2)**
84:20,23
**relayed (4)**
72:13;85:10,11;
96:3
**relevance (1)**
114:12
**relevant (4)**
15:12;46:5;116:4,8
**remainder (1)**
24:24
**remember (47)**
22:15;25:20;27:8,
12,23;37:16,17;49:6,
9,11,13,15,16;50:8;
51:7;57:10;70:4;73:3,
23;74:25;75:17,18;
79:3;82:2;86:5;88:10,
17;89:7,9,18,22,24;
90:2,3,24;91:3,15;
93:9,11;95:9;97:3;
99:24;111:9,13,23;
112:8,10
**remind (4)**
13:24;48:9;93:2;
108:5
**reminding (1)**
50:14
**repeat (1)**
59:8
**rephase (3)**
11:14;20:9;62:15
**rephrase (2)**
6:2;59:9
**report (3)**
78:25;91:22;92:19,
21;96:9
**reported (1)**
92:17
**REPORTER (3)**
5:6;6:9;24:14
**reports (1)**
60:3
**represent (1)**
5:15
**representation (2)**
55:20;56:2

**represented (1)**
28:2
**request (1)**
113:24
**requested (2)**
24:12;31:22
**requesting (1)**
114:7
**reread (1)**
24:10
**res (2)**
115:9,18
**reserve (2)**
118:18,22
**reserved (2)**
4:17,17
**respect (1)**
85:22
**respectful (3)**
11:11;52:12;104:3
**respectfully (7)**
11:22;14:2;47:15;
103:18;104:4;105:16;
115:22
**respective (1)**
4:4
**responses (2)**
6:8,10
**responsibilities (3)**
40:20;42:3,13
**responsible (8)**
45:10,13;48:12;
99:17,22,22,25;100:4
**restaurant (1)**
112:25
**resume (1)**
91:6
**retail (1)**
44:14
**reveal (1)**
20:25;22:10
**review (3)**
12:16;55:23;118:18
**reviewed (1)**
55:24
**reviewing (2)**
12:18;64:16
**right (28)**
17:9;34:23;40:7;
41:7;46:21;52:24;
56:4;67:6;81:8,12;
83:7,9;85:4,24;87:17,
20,21,24;88:4;92:23;
103:4;107:12;113:18;
115:6;116:16,18;
118:18,22
**rights (5)**
67:3,5,9,16;117:16
**room (4)**
10:6;38:16;46:8;
116:13
**rules (1)**
5:19

## S

**sales (14)**
41:25;45:15,18,18,
19;46:13,14;47:10,17,
22,23;48:4,7;91:9
**salesmen (1)**
91:10
**salesperson (1)**
47:3
**same (18)**
4:11;19:7;23:10;
30:6;36:2;39:14,22;
40:2,12,16;52:14;
89:11;97:8;107:18;
109:20,23;110:2;
113:19
**Samsung (1)**
96:25
**Saturday (1)**
44:16
**Saturdays (2)**
44:12,13
**Saturday's (1)**
44:13
**saw (2)**
67:21,23
**saying (8)**
52:23;81:6;83:15;
86:21;92:8;93:22;
117:18,25
**schedule (11)**
34:25;42:23;43:24;
55:16,20;81:5;83:20;
84:11,12;86:14;87:13
**scheduling (11)**
29:10,16,17,19;
30:8;31:6;40:6;77:17;
78:8,19;80:23
**Schofield (1)**
113:13
**screen (4)**
103:11;104:7,15;
108:11
**sealing (1)**
4:5
**sec (2)**
10:18;35:12
**second (6)**
8:15,19;20:17;
75:25;76:15;101:11
**seeing (1)**
32:18
**seeking (10)**
17:4,7,13,18;46:5;
114:4,18;115:7;
117:6,8
**seems (2)**
15:8;117:23
**sell (3)**
91:9,18;95:10
**Selling (1)**

41:22
**September (6)**
51:23,24;70:9;71:2;
110:5,8
**series (2)**
54:24;64:11
**services (2)**
25:19;26:10
**set (1)**
65:17
**seven (4)**
43:15;58:21;59:4,
11
**several (6)**
26:18;27:15;42:4;
68:9;69:18;76:5
**shake (1)**
6:11
**shall (2)**
4:6;118:12
**share (1)**
21:5
**sheet (3)**
55:19;58:12;114:22
**SHEETS (3)**
54:22,25;58:16
**shirt (2)**
25:8,14
**short (4)**
37:22;49:10;
111:21;112:11
**shorter (1)**
37:20
**shot (1)**
108:11
**shoulders (1)**
71:9
**show (2)**
32:7;107:13
**showing (9)**
64:11;66:11;81:23;
84:7;103:8,10;104:7;
105:7;106:2
**shows (1)**
117:9
**side (4)**
41:8,8;83:3,3
**sign (1)**
105:25
**signed (5)**
4:9,12;38:14,16;
120:20
**simple (1)**
37:22
**single (1)**
84:9
**situations (1)**
102:3
**six (2)**
48:17,21
**slow (1)**
43:15
**sold (2)**

95:13,20
**somebody (1)**
17:17
**someone (2)**
28:3;104:5
**sometime (1)**
85:3
**sometimes (5)**
24:25;43:8,8;68:4;
72:7
**Sorry (5)**
52:16;79:14,19;
89:16;93:16
**sort (1)**
118:7
**sound (1)**
115:15
**Southern (2)**
20:4;23:4
**speak (29)**
6:7,12,25;7:14;
72:8,9;74:9,12,14;
77:19;78:3,7,12,17,
22,23;86:15;87:2,3,5,
9,25;97:21,23;98:7,
21;99:5,8,14
**speaker (1)**
113:8
**speaking (6)**
8:3;30:7;36:3;
71:19,20;86:17
**specifically (2)**
14:6;113:25
**Spoke (7)**
7:25;72:11;77:13,
16,22;97:18;98:3
**spoken (2)**
84:19,19
**sporadic (1)**
98:17
**SS (1)**
120:4
**start (11)**
25:18,24;26:9,16;
35:7,11;89:6;90:8;
110:3,16;111:11
**started (30)**
26:13,21;27:2,14,
18;36:4;37:25;39:24;
40:14;50:4,10,15,20;
51:3;61:11,18;77:20,
24;78:5,10;88:18,19,
21,24;89:4,5;90:6,12;
101:2;110:10
**starting (2)**
27:5;44:15
**starts (1)**
27:24
**State (29)**
5:3,6;11:5,16;12:2,
6,8,15;16:4;17:25;
18:5;22:7,14,19;
23:23;34:24;35:10;

102:9;114:2,6,11,22;
115:2,16;116:3;
117:10;118:21;120:3,
25
**stated (2)**
79:4;96:8
**STATEMENTS (2)**
64:9,12
**states (9)**
17:9;34:22;56:10;
57:11;72:16;83:25;
87:11,18;98:13
**stating (3)**
29:24;60:12;61:9
**stay (2)**
43:16;98:19
**stays (1)**
84:5
**Step (1)**
116:16
**stick (3)**
69:22;71:8,11
**still (6)**
24:15;59:24;80:10,
14;96:17;117:4
**STIPULATED (3)**
4:3,8,15
**stock (1)**
45:8
**stop (2)**
6:5;51:5
**stopped (2)**
79:5;112:4
**store (20)**
25:12,16,17;41:11,
15,20,24;42:10;44:19,
23;45:11,14,16;59:22,
24;60:4;66:13;73:11;
87:22;98:18
**stores (1)**
109:17
**straightforward (2)**
95:5;100:17
**straight-time (2)**
93:12,24
**stub (2)**
65:13,14
**stubs (4)**
64:22;65:3,4,11
**stuff (3)**
13:5;80:19;100:20
**stylist (1)**
109:10
**submit (2)**
90:19,22
**subscribed (1)**
120:20
**substantial (2)**
117:13,22
**successful (1)**
42:16
**sue (1)**
17:2

**summertime (2)**
62:4;89:25
**summons (6)**
12:14;20:6,8,10,12;
26:8
**Sunday (1)**
44:11
**Sundays (1)**
44:17
**supervisor (7)**
68:8;69:17;70:18,
19,22;79:2;85:7
**supervisors (1)**
71:22
**supervisor's (5)**
70:3,7,10,15;71:4
**support (1)**
117:2
**supposed (1)**
66:24
**Supreme (2)**
11:5,16
**sure (21)**
5:17;6:7,10,12;7:4;
10:17,23;18:12,24;
45:5,7;54:16,17;63:4;
78:2;84:5;85:12;
89:19;96:4;107:14;
117:19
**surrounding (6)**
8:14;14:16;15:2;
26:21;114:5,10
**switched (1)**
96:19
**sworn (3)**
4:9,12;5:2
**system (2)**
56:24;57:23

**T**

**table (1)**
38:13
**talk (5)**
18:23;28:7;46:20;
98:21;116:13
**talked (2)**
28:10,11
**tall (1)**
49:10
**team (14)**
42:6,11;45:15,18,
18,19;46:13,14;47:10,
18,22,23;48:4,7
**telling (1)**
20:24
**tells (2)**
45:23;66:23
**ten (18)**
8:21;9:11;60:24,24;
61:7,20,21;62:7;
73:19,20;94:15;
95:12,13,17,18,20,22;

98:16
**terminate (1)**
81:14
**terminated (13)**
80:4,25;81:4,7,8,10,
12;82:8,20;102:25;
112:20,22;113:2
**termination (1)**
35:2;79:9;82:12
**terms (2)**
34:21;52:12
**testified (3)**
5:4;50:3,14
**testifying (4)**
50:9,19,21;51:2
**testimony (15)**
10:24;21:18;26:12;
31:22;32:17;33:25;
37:23;50:24;54:10,
13;63:10;117:5,9;
120:8,11
**texting (1)**
49:22
**thirty (2)**
79:12,16
**thirty-minute (1)**
79:16
**thought (1)**
111:9
**thousand (5)**
95:12,13,17,18,20
**three (5)**
25:23;52:3;62:2;
94:17;100:20
**times (15)**
48:17;68:9;69:18;
73:14,16,19,20,24;
74:9;76:5;84:14;
97:16;98:14,16;
105:16
**title (1)**
40:23
**Tiziano (13)**
109:9,12,16;110:3,
7,11,17,25;111:2,11;
112:12,15,21
**today (27)**
5:17;6:13;7:2,14;
10:24;13:20;14:11;
21:18;32:15,18;
33:25;34:2,4;37:23;
39:15;45:20;50:9,14,
19;56:5;69:8;88:12;
104:25;105:6;107:8,
9,18
**today's (3)**
7:24;8:4;118:24
**together (1)**
58:9
**told (17)**
9:22;37:12;47:5;
49:18;76:5;77:10;
79:12;81:7,11;86:7;

88:13;91:5;94:7,14,
20;99:2,14
**ton (1)**
21:13;42:6,8;
104:22
**took (1)**
85:4
**top (5)**
13:10,12;19:20;
33:17;108:18
**topic (1)**
71:25
**total (6)**
55:10;56:12,19;
60:14;65:6,6
**toward (1)**
8:25
**towards (1)**
35:22
**town (2)**
80:9,12
**track (1)**
58:3
**trained (5)**
100:10,15,16,19,25
**transactions (3)**
41:11,23;42:11
**transcript (3)**
118:19;120:8,10
**translated (1)**
90:11
**travel (1)**
51:14
**treated (1)**
16:25
**trial (1)**
4:18
**tried (1)**
49:16
**trip (3)**
84:18;85:4,7
**true (2)**
120:10,12
**truth (1)**
116:24
**truthfully (2)**
6:25;7:14
**try (1)**
49:14
**trying (5)**
16:21;27:6;46:11;
50:17;115:10
**turning (1)**
45:5
**two (17)**
23:13,15,19;25:23;
48:7;53:19;75:12;
76:11,18;88:7,8,13;
91:12,17;92:6;
100:19;117:21
**typically (4)**
43:2,11,18,21

88:13;91:5;94:7,14,
20;99:2,14

**U**

**ultimately (2)**
115:10,13
**unanswered (1)**
115:25
**uncovered (1)**
118:24
**under (5)**
40:22;41:7;48:10;
108:5;120:9
**unfairly (3)**
16:25;17:10,11
**United (4)**
72:16;87:11,18;
98:12
**Unless (4)**
14:6;24:18;45:23;
108:6
**unlocking (1)**
45:4
**unpaid (11)**
17:3,10,11;62:13,
17,19;63:2,5,14,17;
64:2
**up (13)**
9:25;15:22;26:25;
27:4;45:8;61:2;62:6;
65:17;71:25;72:2;
79:9;84:8;107:9
**upon (1)**
82:12
**use (1)**
8:25
**used (1)**
97:4
**using (2)**
16:23;97:20

**V**

**vacation (1)**
84:18
**vacations (2)**
51:12,13
**vendors (4)**
99:5,8,11,14
**verbal (1)**
6:8
**Verizon (2)**
96:21,24
**via (1)**
24:16
**Vincent (95)**
27:22,24;28:7,21;
29:5,9,15,18;30:3,4,
21,23;31:2,6;35:23;
36:2;38:15,18;49:22;
70:14,20;72:5,11,15;
75:9,22,23,24;76:16,
21,21,23;77:7,9,25;
79:10,12,13,18,19;

80:3,6,8;81:3,5,7,9;
82:9,14,18,23,24,25;
83:7;84:20,20,22;
85:10,11,14,15;86:11,
25;87:4,6,10,14,16;
90:10,17;91:7;92:19;
93:15,22;94:9,22,24;
96:2,3,7,12,13;97:9,
25,25;98:4;99:4,16;
100:3,13,25;103:8,9,
10;104:6

**Vincent's (1)**
72:6

**voice (1)**
6:12

## W

**wage (5)**
29:3;64:8,12;66:9,
12

**wages (4)**
17:3,19,20;66:23

**Wait (1)**
114:20

**waived (1)**
4:6

**walk (2)**
41:9;91:16

**wants (1)**
106:16

**way (5)**
5:22;42:17,18;
104:3;117:18

**ways (1)**
42:19

**website (1)**
41:12

**week (33)**
29:20;40:15;48:17,
19,21;52:9,18;53:7,
12,13,16,20,23,25;
54:4,11,14,14;55:11;
56:11,12,18,22;57:2,
4,12,15,19,21;58:24;
59:21;63:15,18

**weekly (5)**
34:25;42:23;43:24;
55:16,20

**weren't (3)**
63:11;69:12,13

**WhatsApp (1)**
75:2

**whole (4)**
74:7;76:10;89:15;
98:20

**Whose (1)**
70:13

**wife (4)**
73:10;75:9;87:7;
98:22

**wildest (1)**
116:10

**within (1)**
4:6

**without (1)**
14:23

**Witness (9)**
5:1,8;26:7;53:5;
101:12,17;102:3,16;
106:14

**word (1)**
50:22

**wording (1)**
19:8

**words (7)**
16:23;21:15,19;
37:7,17,19,21

**work (32)**
27:5;37:25;43:3,12,
14,18,20,22;46:21;
49:25;50:2;52:5,8,17;
53:7,14,18,22;56:21,
25;57:15,18,21;
59:20;63:9;69:23;
76:9;83:16;84:8;90:3,
13;109:11

**worked (33)**
41:7;44:21;53:12,
17;54:4,8,11,13;
55:11;56:2,18;57:4,9,
12;59:3,11,18;60:9,
14;63:8,11;65:6;66:4;
68:23;76:11;83:2;
84:13;88:3,12;93:13,
21,24;111:16

**working (57)**
25:24;26:13,16,21;
27:2,14,18;36:4;
39:24;40:14,15;
46:19;50:4,10,15,20;
51:3,5;56:11;59:24;
61:11,18;65:14;
77:20,24;78:5,10;
79:5;87:21;88:18,19,
21,25;89:4,5,6;90:6,8,
12;101:2;109:13,15;
110:3,7,10,14,16,17;
111:2,3,6,7,11,14,18,
20;112:5

**write (3)**
82:9,14;83:4

**wrongly (1)**
82:20

**wrote (1)**
82:21

## Y

**year (7)**
15:4;26:11;76:10,
12;89:11,14,15

**years (3)**
8:21;9:11;25:23

**York (14)**
5:3,9;11:6,16;12:2;

16:4;20:4;22:14,20;
23:4,23;67:6,17;
120:3

**young (1)**
49:12

## Z

**Zorzan (7)**
109:9,12,16;110:4,
7,17;111:12

## 1

**1 (7)**
12:5,7,8;19:9;
22:18;55:2;64:12

**10 (8)**
43:4,7,8,25;44:6,8,
13,16

**100 (2)**
62:22,23

**10456 (1)**
5:9

**11 (14)**
28:24;43:4,6,7,9,
25;44:7,10,16;62:9;
68:24;94:16,18;95:22

**12 (1)**
95:23

**12:49 (1)**
119:4

**15 (5)**
32:7;33:3;38:5;
50:4;53:23

**15th (1)**
32:5

**16 (6)**
32:2;50:10;52:23;
60:9;72:23;73:6

**16th (1)**
51:3

**17 (2)**
60:10;73:6

**18 (5)**
35:7,11;54:25;
60:14;63:15

**18th (3)**
56:11;57:2,5

## 2

**2 (8)**
18:4,5;26:4;54:4;
57:16;63:21;64:13;
81:24

**2,000 (1)**
74:18

**2015 (2)**
25:21,22

**2016 (30)**
26:14;32:2,8;33:3;
35:7,11;38:6;50:4,10;

51:3,11,24;52:5;
53:23,25;54:4,25;
56:18;57:16,19,22;
62:6;63:15,21,21,23;
64:12;74:2;89:10,13

**2017 (22)**
22:7,14,20,24;
23:23;26:11;51:8,11;
52:6;64:13;72:21;
73:21;74:2;79:6;
81:24;89:13;110:5,8;
112:7,9;115:3;116:3

**2018 (3)**
23:5;55:2;110:6

**2019 (6)**
25:22;103:12;
104:9,17;120:9,21

**24 (3)**
6:14;7:11,21

**25 (3)**
53:25;56:18;63:19

**25th (1)**
56:22

**26 (4)**
103:12;104:9,17;
105:6

**27th (1)**
105:6

**28 (4)**
56:12;57:3,4;120:9

**28th (1)**
105:5

**2nd (1)**
57:12

## 3

**3 (3)**
31:13,14,25

**3,000 (1)**
74:19

**30 (1)**
57:22

**38 (4)**
56:19;57:12;59:19;
93:21

## 4

**4 (2)**
54:20,21

**40 (19)**
29:11,20;40:15;
42:25;52:9,18;53:7,
12,17,18;54:6,7,8,11,
14;58:24;59:21;
68:24;84:13

**41 (1)**
93:21

## 5

**5 (2)**

64:7,8

## 6

**6 (2)**
66:7,8

## 7

**7 (2)**
81:19,20

## 8

**8 (3)**
7:9;107:20;108:9

## 9

**9 (2)**
57:19;63:23

**936 (1)**
5:8